539 A.2d 412

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Thomas K. DOUGLASS, Appellee.**

Superior Court of Pennsylvania.

Argued May 14, 1987.

Filed March 14, 1988.

228

230

Patrick H. Mahady, Latrobe, for appellee.

Before WIEAND, KELLY and POPOVICH, JJ.

KELLY, Judge:

The Commonwealth appeals from an order dismissing a homicide by vehicle while driving under the influence (75 Pa.C.S.A. § 3735) complaint against appellee, Thomas K. Douglass, based upon an alleged violation of Pa.R.Crim.P. 130. The Commonwealth presents two contentions on appeal: first, that the trial court erred in concluding that an "arrest" had occurred within the meaning of Pa.R.Crim.P. 130; and second, that the trial court erred in concluding that the five day period for filing a complaint prescribed by Pa.R.Crim.P. 130(d) had expired. Appellee responds that the first contention is without merit, and that the second contention was not raised in the trial court, and therefore, has been waived. We find merit in the first contention; and accordingly, vacate the order of the trial court, reinstate the complaint, and remand for further proceedings. In light of our disposition of the Commonwealth's first contention, we do not decide whether the second issue has been properly preserved.[1]

I.

Ordinarily, a decision to dismiss a complaint is deemed an interlocutory order, and the Commonwealth's sole avenue of redress is to bring the matter before a new issuing authority before the expiration of the statute of limitations period. *See Commonwealth v. Revtai*, 516 Pa. 53, 66, 532 A.2d 1, 11 (1987); *Commonwealth v. Allem*, 367 Pa.Super. 173, 182, 532 A.2d 845, 848 (1987). Nonetheless, this Court granted immediate appeal of an identical order in *Commonwealth v. Press*, 342 Pa.Super. 507, 493 A.2d 705 (1985) and, on review, our Supreme Court gave no indication that direct appeal of the discharge order was improper. Thus, we find that an order granting discharge on grounds which would ostensibly preclude the refiling of new charges is not subject to *de novo* review by another issuing authority, but is instead subject to direct appeal as a final order.

---

1. We note, however, that if it were properly preserved, it would likewise compel reinstatement of the charges against appellee. (Discussed briefly, *infra*).

*Cf. Commonwealth v. Prado,* 481 Pa. 485, 488, 393 A.2d 8, 10 (1978) (where local rule effectively precludes the refiling of the complaint before another issuing authority a direct appeal of the dismissal of the complaint is permitted); *accord Commonwealth v. Allem, supra,* 367 Pa.Superior Ct. at 179, 532 A.2d at 848. Because the order purports to preclude the refiling of charges in the instant case,[2] we find that the Commonwealth is effectively "out of court" and that the order is final for purposes of review.

## II.

█ Although we are aware of no cases directly on point, we find that the scope of review for an appeal from an order granting a discharge for violation of Pa.R.Crim.P. 130 is undoubtedly the same as the scope of review of suppression orders entered for violations of Pa.R.Crim.P. 130. *Cf. Commonwealth v. Duncan,* 514 Pa. 395, 399–402, 525 A.2d 1177, 1179–80 (1987). That limited scope of review was summarized in *Commonwealth v. White,* 358 Pa.Super. 120, 516 A.2d 1211 (1986), as follows:

> Our scope of review is limited primarily to questions of law. We are bound by the suppression court's findings of fact, if those findings are supported by the record. In determining whether the findings of fact are supported by the record, we are to consider only the evidence of the appellees and so much of the evidence of the appellant which, as read in the context of the record as a whole, remains uncontradicted. It is for the suppression court as the trier of fact, rather than the reviewing court, to determine credibility.

**2.** Although the issue is not raised by the Commonwealth in this appeal, we note that in the wake of *Revtai,* it is uncertain whether discharge is an appropriate remedy even when Pa.R.Crim.P. 130(d) has been violated. We note further that when Pa.R.Crim.P. 130 has been violated and prejudice has been established, the appropriate remedy is ordinarily the suppression of evidence derived as the result of the violation, and not dismissal of the charges with prejudice. *Cf. Commonwealth v. Johnson,* 291 Pa.Super. 566, 436 A.2d 645 (1981); *Commonwealth v. Beatty,* 281 Pa.Super. 85, 421 A.2d 1159 (1980).

However, we are not bound by findings wholly lacking in evidence. Nor are we bound by the suppression court's conclusions of law.

358 Pa.Superior Ct. at 123, 516 A.2d at 1212–13 (citations omitted).

## III.

The facts of this case were summarized by the trial court as follows:

Defendant was involved in an automobile accident at approximately 8:00 P.M. on May 12, 1986, with Steven M. Ramsey, who died as a result of this accident.

At approximately 8:50 P.M. Trooper Ault of the Pennsylvania State Police arrived at the accident scene. Trooper Ault testified that from his investigation, he determined that defendant's vehicle had crossed over the center line striking the victim's vehicle in the victim's lane of traffic. Further investigation by the officer and questioning of the defendant led Trooper Ault to believe that defendant had been driving under the influence. Trooper Ault determined that the defendant had an odor of alcohol about his person, and further defendant admitted that prior to the accident he had consumed 'a few beers'. Trooper Ault directed that the defendant remain at the accident scene while he continued his investigation. The Trooper completed his investigation at approximately 11:00 P.M. and requested the defendant to accompany him to the State Police Barracks in order that an intoxilyzer test could be administered to the defendant. The defendant complied and two tests were performed, but the differentiation in results made the tests invalid. At approximately 11:45 P.M. Trooper Ault requested that the defendant accompany him to the Indiana Hospital for the purpose of obtaining a blood sample, defendant complied. The results of the blood tests were received from the State Police Laboratory May 14, 1986, showing that the defendant's blood alcohol content was .105% on May 12, 1986. A criminal complaint was filed against the defend-

ant by Officer Ault on May 19, 1986, charging the defendant with driving under the influence of alcohol and homicide by vehicle while under the influence of alcohol. (Trial Court Opinion at 1–2).

Although this summary of the facts of the case is generally supported by the record,[3] for reasons which shall become apparent, *infra*, we find that a more precise statement of certain facts "which as read in the context of the record as a whole, remain uncontradicted" is necessary for the proper disposition of this appeal. The trial court's findings of fact are therefore supplemented as follows.

After witnesses indicated that appellee was the driver of one of the vehicles involved in the fatal crash, the investigating officer asked appellee "what happened?" and appellee responded, "I don't know what happened. I think he came over at me. This happened about 8:00." (N.T. 9/29/86 at 5–6, investigating officer; N.T. 9/29/86 at 29, appellee). The officer also asked if appellee needed medical attention; appellee responded that he did not. (N.T. 9/29/86 at 6–7, investigating officer; N.T. 9/29/86 at 29, appellee). Then, "[h]e [the investigating officer] asked me [appellee] to remain at the scene of the accident until he was done with the investigation." (N.T. 9/29/86 at 29, appellee). The investigating officer proceeded to conduct an initial traffic accident investigation, determining the identity of witnesses, securing physical evidence and appropriate measurements, and speaking with the coroner. (N.T. 9/29/86 at 3–7, 13–17, investigating officer; N.T. 9/29/86 at 29–30, appellee). During the investigation, the investi-

3. We note that the suppression hearing transcript contains no testimony whatsoever concerning the police officer's determination that appellee had caused the accident by crossing a double yellow line on the highway or the alleged admission by appellee that he had consumed "a few beers" before the accident. Rather, these "facts" are gleaned from the affidavit of probable cause attached to the complaint filed May 19, 1986. These assertions were not renewed or supported at the suppression hearing. More importantly, there is no evidence whatsoever to support a conclusion that these "facts" were known to appellee or the investigating officer any time during appellee's detention on the night of the accident. Indeed, there is no indication in the affidavit of the time or day when these facts became known to the officer.

gating officer occasionally looked over at, or in the direction of, appellee. (N.T. 9/29/86 at 13–14, investigating officer; N.T. 9/29/86 at 30, appellee).[4] At no time during appellee's detention at the scene of the accident was he told that he was under arrest. (N.T. 9/29/86 at 7, investigating officer; N.T. 9/29/86 at 35, appellee).

The trial court indicated in its opinion that the investigating officer "requested" that appellee submit to a breathalyzer test and later to a blood test, and that appellee "complied." Trial Court Opinion at 2, 4. The trial court also characterized these events by stating that appellee was "directed to remain at the accident scene, and to accompany the trooper to the State Police Barracks and to the hospital for tests of his blood and breath." Trial Court Opinion at 3. To the extent that the trial court's findings may be construed to suggest that appellee did not freely *consent* to being transported to the police barracks and then to the hospital for tests of his breath and blood, we find such findings wholly without support in the record and indeed contrary to the admissions of appellee and the uncontradicted testimony of the investigating officer.

Appellee testified that after the investigating officer completed his initial on-site accident investigation:

A. He asked me if I would go with him, and he asked me if I had any objections to an intoxilyzer.

Q. And what did you respond?

A. I said I did not have any objections.

(N.T. 9/29/86 at 30). Appellee rode with the investigating officer to the police barracks in a patrol car; appellee was not handcuffed. (N.T. 9/29/86 at 8, 17, investigating officer; N.T. 9/29/86 at 30, 35, appellee). At the barracks, appellee was observed for twenty minutes before the breathalyzer tests were performed; the tests were delayed an additional ten minutes when it was discovered that

---

**4.** Although the officer indicated that he spoke with appellee two additional times during this period, to ask appellee if he was "okay" (N.T. 9/29/86 at 6–7), appellee testified he did not remember the officer making any such inquiries. (N.T. 9/29/86 at 30). Neither version affects our disposition of this appeal.

appellee had gum in his mouth (which could negatively affect the results of the test). (N.T. 9/29/86 at 31, appellee). Because of the variance between the test readings, the breathalyzer tests were deemed invalid under applicable regulations. (N.T. 9/29/86 at 9, 23, investigating officer; N.T. 9/29/86 at 31–32, appellee).

The investigating officer then determined that a blood test would be necessary. The investigating officer testified that appellee was asked if he would consent to a blood test and appellee responded that he had no objections. (N.T. 9/29/86 at 10). Appellee testified on direct examination:

Q. Keep your voice up. What did you—What did he then do or direct you to do?

A. He told me we was going to Indiana Hospital to take a blood test.

Q. Did you agree with that?

A. I don't remember if I said anything or not.

(N.T. 9/29/86 at 32). Thus, we find that there is no support in the record for a finding that appellee "complied" rather than "consented," or that appellee's consent to be transported and to take breath and blood tests was "directed" as opposed to "requested."

Upon arriving at the hospital, appellee was permitted to call his wife so that she could take him home after the blood test was completed. (N.T. 9/29/86 at 18, investigating officer; N.T. 9/29/86 at 32, 35, appellee). After appellee's wife arrived, appellee was read the *Miranda* warnings. We note that with regard to those warnings appellee testified on direct examination:

Q. When he advised you of your Miranda Warnings; that is, that you were a suspect in the crime of what I've told you about, at that point in time, did you feel that you were free to go?

A. After he told me—After he read the Miranda Warnings?

Q. Up to that point.

A. No.

Q. When you were read your Miranda Warnings, did that, in fact, tell you something, that you were accused of the commission of a crime?

A. I thought he was *going to* arrest me. I didn't know too much about it.

(N.T. 9/29/86 at 34). (Emphasis added). Apparently, up to the point the *Miranda* warnings were given appellee did not feel he *had been arrested,* and even after the warnings were given he was not certain whether he was *going to be arrested.* Moreover, appellee testified on cross-examination:

Q. Was the word arrest ever used by Trooper Ault?

A. No, sir, just in the Miranda Warnings.

Q. Just in the Miranda Warnings. Before he gave you the Miranda Warnings, he didn't even mention that you were a suspect in any particular crime, did he?

A. No, sir.

Q. And certainly *you knew you would be free to go once you were given permission to call your wife,* isn't that correct?

A. *Yes, sir.*

(N.T. 9/29/86 at 35). (Emphasis added). With the trial court's statement of the facts thus supplemented, we proceed to a review of the merits of the appeal.

## IV.

The Commonwealth first contends that the trial court erred in concluding that appellee was "arrested" so as to trigger commencement of the five day rule of Pa.R.Crim.P. 130(d). The Commonwealth argues that appellee's detention at the scene and the detention necessary to complete the blood tests were merely investigative and not custodial and, therefore, no "arrest" occurred to trigger application of Pa.R.Crim.P. 130(d). The Commonwealth cites in support of its argument *Commonwealth v. Quarles,* 229 Pa. Super. 363, 324 A.2d 452 (1974).

Appellee responds that any act or acts which indicate an intention to take a suspect into custody and subject the suspect to the control and will of the police constitute an arrest. Appellee argues that, because he reasonably believed that he was not free to leave, an arrest for the purposes of Pa.R.Crim.P. 130 had occurred. Appellee cites in support of his argument: *Commonwealth v. Haggerty,* 495 Pa. 612, 435 A.2d 174 (1981); *Commonwealth v. Meyer,* 488 Pa. 297, 412 A.2d 517 (1980); *Commonwealth v. Richards,* 458 Pa. 455, 327 A.2d 63 (1974); *Commonwealth v. Maddox,* 307 Pa.Super. 524, 453 A.2d 1010 (1982); *Commonwealth v. Benson,* 280 Pa.Super. 20, 421 A.2d 383 (1980); and *Neitz v. Commonwealth, Dept. of Transportation,* 96 Pa.Cmwlth. 1, 506 A.2d 961 (1986).

The trial court found that appellee was "arrested" for the purposes of Pa.R.Crim.P. 130. Because we find that appellee was never subjected to formal arrest or a *custodial* detention, we cannot agree. Our reasoning follows.

### A.

■ A police encounter with a suspect may properly be characterized as a mere encounter, an investigative detention, a custodial detention, or a formal arrest. *See generally* 3 *LaFave, Search and Seizure,* §§ 9.1, 9.2 at 332–422 (1987) (discussing the genesis of the *Terry* stop and the limits of permissible investigative detentions); LaFave, *Classifying Detentions of the Person to Resolve Warrant, Grounds, and Search Issues,* 17 U.Mich.J.L.Ref. 417, 417–438 (1984); McGinley, *Characterizing Police Encounters Under the Fourth Amendment: Inquiry, Stop, or Arrest?,* 10 Search and Seizure L.Rep. 157, 157–164 (1983).

■ A "mere encounter" (or request for information) need not be supported by any level of suspicion, but it carries no official compulsion to stop or to respond. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). An "investigative detention" must be supported by reasonable suspicion; it subjects the suspect to a stop and a period of detention, but does not involve such coercive

conditions as to constitute the functional equivalent of arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A "custodial detention" must be supported by probable cause; it is deemed to arise when the conditions and/or duration of an investigating detention become so coercive as to be the functional equivalent of arrest. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Formal arrest requires probable cause, and needs no further definition.

### B.

Under Pa.R.Crim.P. 130(a), when a suspect is arrested without a warrant, the Commonwealth is required to file a complaint and bring the suspect before an issuing authority for a prompt arraignment "without unnecessary delay." Case law clearly indicates that a primary purpose of the rule was to put a stop to the practice of taking a suspect into custody and holding the suspect for a lengthy period of interrogation and/or detention in a coercive environment before presenting the suspect for arraignment. *See Commonwealth v. Duncan, supra*, 514 Pa. at 404, 525 A.2d at 1180–81; *see also Commonwealth v. Eaddy*, 472 Pa. 409, 372 A.2d 759 (1977). Under Pa.R.Crim.P. 130(b-d) the police are authorized to release persons arrested without warrant and accused of certain crimes, providing a complaint is filed and summons is issued within five days. This narrow exception to the prompt arraignment mandate of Pa.R. Crim.P. 130(a), substitutes prompt release for prompt arraignment and thereby serves the primary purpose of the rule, *i.e.* freeing the suspect from the coercive atmosphere of a custodial detention.

In view of the purpose which Pa.R.Crim.P. 130 is designed to effectuate, we find that the term "arrest" as used in the context of that rule must be construed to include either formal arrest or its functional equivalent, a custodial detention. We find that the rule cannot reasonably be construed to include investigative detentions. In-

vestigative detentions may be based upon reasonable suspicion; if however, Pa.R.Crim.P. 130(d) was triggered by an investigative detention, the officer initiating such a detention would have to gamble on confirming his suspicions and uncovering enough new evidence to establish probable cause, or having the suspect discharged or evidence suppressed because probable cause was not established to permit the filing of a complaint within five days. Pa.R. Crim.P. 134(a)(2) and (b)(1). Also significant in our determination that an investigative detention does not trigger the five day rule of Pa.R.Crim.P. 130(d), is the fact that, *by definition*, investigative detentions are free of the coercive aspects of custodial detentions and formal arrest, against which Pa.R.Crim.P. 130 is directed.

Consequently, we find that the dispositive issue in the instant case is whether appellee was subjected to an *investigative* detention or a *custodial* detention. In *Commonwealth v. Duncan, supra,* our Supreme Court explained:

*Appellant first contends that the finding that Appellee was under arrest at the time of his freely volunteered statement is not supported by the record and that 'at most' Appellee was detained for a brief investigatory stop. It is Appellant's position that at the moment the Appellee made his unsolicited confession he had not been taken into custody so as to effectuate an arrest. Appellant also correctly notes, that if the Appellee was not under arrest at the time of his statement, the rule of Davenport is not applicable to this case.*

Appellee, on the other hand, contends that the police had exercised control over his freedom from the moment of the initial stop and that he was not free to go at any time. This Court has utilized the following test for determining whether an arrest has occurred:

*We have defined an arrest as any act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest.*

*Commonwealth v. Lovette,* 498 Pa. 665, 450 A.2d 975 (1982), *citing Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304 (1963). *See also Commonwealth v. Haggerty,* 495 Pa. 612, 435 A.2d 174 (1981), and *Commonwealth v. Nelson,* 488 Pa. 148, 411 A.2d 740 (1980). An arrest may thus be effectuated without the actual use of force and without a formal statement of arrest. *Commonwealth v. Daniels,* 455 Pa. 552, 317 A.2d 237 (1974).

> The test is an objective one, i.e., viewed in the light of the reasonable impression conveyed to the person subjected to the seizure rather than the strictly subjective view of the officers or the persons being seized.

*Commonwealth v. Haggerty, supra,* 495 Pa. at 615, 435 A.2d at 175, *citing Commonwealth v. Richards,* 458 Pa. 455, 327 A.2d 63 (1974). We have also held that a police officer's subjective view that a defendant was not free to leave is of no moment *absent an act indicating an intention to take the person into custody. Commonwealth v. Holmes,* 482 Pa. 97, 393 A.2d 397 (1978).

514 Pa. at 400, 525 A.2d at 1179. (Emphasis added). In both *Duncan* and *Lovette,* our Supreme Court explained that whether an encounter is to be deemed "custodial" must be determined with reference to the totality of the circumstances. *Commonwealth v. Duncan, supra,* 514 Pa. at 402, 525 A.2d at 1180; *Commonwealth v. Lovette, supra,* 498 Pa. at 672, 450 A.2d at 978.

## C.

The trial court concluded that appellee was arrested on the night of the accident because: appellee was asked to remain at the scene of the accident during the investigating officer's initial two hour investigation; appellee was then asked to submit to blood alcohol tests which involved an additional period of detention of one and one-half hours; and, appellee was given *Miranda* warnings at the hospital prior to taking the blood test. *See* Trial Court Opinion at 4. The trial court's focus was directed to the issue of whether appellee reasonably believed that he was not free to leave during these periods of detention; as will be seen *infra,*

this was not the proper focus for resolution of the issue of whether an arrest had occurred for the purposes of Pa.R. Crim.P. 130.

1.

In *Commonwealth v. Bruder*, 365 Pa.Super. 106, 528 A.2d 1385 (1987), a divided panel of this Court stated that a "custodial interrogation" occurs whenever "the individual being interrogated reasonably believes his freedom of action is being restricted." 365 Pa.Superior Ct. at 111, 528 A.2d at 1387, *quoting Commonwealth v. Meyer*, 488 Pa. 297, 307, 412 A.2d 517, 521 (1980). However, standing by itself this *dictum* is somewhat misleading.

It is well settled that a custodial detention involves something more than mere exercise of control over the suspect's freedom of movement. While a suspect may certainly walk away from a *mere encounter* with a police officer, *every* traffic stop and *every Terry* stop involves a stop and a period of time during which the suspect is not free to leave but is subject to the control of the police officer detaining him. *See Berkemer v. McCarty, supra; Commonwealth v. White, supra,* 358 Pa.Superior Ct. at 131, 516 A.2d at 1217, *citing Commonwealth v. Jones,* 474 Pa. 364, 378 A.2d 835 (1977), *cert. denied* 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978).

The Supreme Court explained in *Berkemer* that:

It must be acknowledged at the outset that *a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle.*

\* \* \* \* \* \*

*However, we decline to accord talismanic power to the phrase in the Miranda opinion emphasized by respondent.* Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. Thus, *we must determine whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of*

*his privilege against self-incrimination to require that he be warned of his constitutional rights.*

468 U.S. at 436–37, 104 S.Ct. at 3148–49, 82 L.Ed.2d at 332–33. (Emphasis added).

The *Bruder* majority characterized the *Berkemer* analysis and holding as follows:

In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the United States Supreme Court ruled that a motorist was not in custody when he was stopped by a police officer who asked 'a modest number of questions and requested him to perform a simple balancing test visible to passing motorists.' 468 U.S. at 442, 104 S.Ct. at 3151. As in the case at bar, the driver in *McCarty* was stopped after being suspected of driving under the influence of alcohol, admitted that he had had a few drinks, and failed a balancing test before being advised of his *Miranda* rights. The Court in *McCarty,* however, refused to adopt a bright line test which would have definitely answered the question of whether *Miranda* applies to all traffic stops or whether a suspect need be advised of his rights only when he is formally placed under arrest. 468 U.S. at 441, 104 S.Ct. at 3151. *Thus, we are afforded a measure of flexibility in deciding exactly when a suspect has been taken into custody.*

365 Pa.Superior Ct. at 111, 528 A.2d at 1387. (Emphasis added). While the *Berkemer* holding is certainly flexible, we are not without guidance.

The actual holding in *Berkemer* was as follows:

*[T]he usual traffic stop is more analogous to a so-called 'Terry stop,' see Terry v. Ohio, 392 U.S. 1, 20 L Ed 2d 889, 88 S Ct 1868 (1968), than to a formal arrest.* Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.' *United States v. Brignoni–Ponce,* 422 US 873, 881, 45 L Ed 2d 607, 95 S

Ct 2574 [2580] (1975). *'[T]he stop and inquiry must be "reasonably related in scope to the justification for their initiation."'* Ibid. (*quoting Terry v. Ohio, supra,* at 29, 20 L Ed 2d at 889, 88 S Ct at 1868). Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. *The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda.*

Respondent contends that to 'exempt' traffic stops from the coverage of *Miranda* will open the way to widespread abuse. Policemen will simply delay formally arresting detained motorists, and will subject them to sustained and intimidating interrogation at the scene of their initial detention.

\*　　\*　　\*　　\*　　\*　　\*

We are confident that the state of affairs projected by respondent will not come to pass. *It is settled that the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'* *California v. Beheler,* 463 US 1121, 1125, 77 L Ed 2d 1275, 103 S Ct 3517 (1983) (per curiam). *If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda.* *See Oregon v. Mathiason,* 429 US 492, 495, 50 L Ed 2d 714, 97 S Ct 711 (1977) (per curiam).

468 U.S. at 439–40, 104 S.Ct. at 3150, 82 L.Ed.2d at 334–35. The clear import of *Berkemer* is that traffic stops, like

*Terry* stops, constitute *investigative* rather than *custodial* detentions, unless under the totality of circumstances the conditions and duration of the detention become the functional equivalent of an arrest.[5]

 This characterization of the holding in *Berkemer* is consistent with recent decisions of this Court which have examined the totality of circumstances rather than focusing on a single factor in determining whether a challenged encounter with police was *investigative* or *custodial. See e.g. Commonwealth v. Fento,* 363 Pa.Super. 488, 498–99, 526 A.2d 784, 786–89 (1987); *Commonwealth v. Grove,* 363 Pa.Super. 328, 340–41 & n. 7, 526 A.2d 369, 375–76 & n. 7 (1987); *Commonwealth v. White, supra,* 358 Pa.Superior Ct. at 130, 516 A.2d at 1217. Among the factors generally considered in determining whether a detention is investigative or custodial are: the basis for the detention (the crime suspected and the grounds for suspicion); the duration of the detention; the location of the detention (public or private); whether the suspect was transported against his will (how far, why); the method of detention; the show, threat, or use of force; and, the investigative methods used to confirm or dispel suspicions. *See generally* 3 *LaFave, Search and Seizure, supra;* LaFave, *Classifying Detentions, supra;* NcGinley, *Characterizing Police Encounters, supra.*

### 2.

 The facts, as found by the trial court and supplemented by this Court, *supra,* establish that from approxi-

---

**5.** It should be noted that *Commonwealth v. Meyer, supra,* involved facts which would clearly have met the *Berkemer* standard. In *Meyer,* an obviously intoxicated driver who was involved in a one car accident was directed by a local police officer to remain at the scene of the accident until the state police arrived; probable cause to arrest rather than reasonable suspicion existed at the time of the initial detention; no investigation to quickly confirm or dispel "reasonable suspicions" was conducted during the half hour detention; and, the driver was directed to sit in the back of the police squad car for part of the half hour detention. Under those circumstances, *custody,* as the *Berkemer* decision construes the term, was established.

mately 9 p.m. to 11 p.m. appellee was detained at the scene of a fatal automobile accident. Concededly, the two hour detention was considerably longer than the brief detentions involved in either *Terry* or *Berkemer*. However, while the duration of the detention is a highly relevant factor, it is important to recall that:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect]. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second guessing.

*Commonwealth v. White, supra,* 358 Pa.Superior Ct. at 128, 516 A.2d at 1215, *quoting Commonwealth v. Mayo,* 344 Pa.Super. 336, 341–42, 496 A.2d 824, 826 (1985), *quoting United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605, 615–16 (1985); *accord United States v. Montoya De Hernandez,* 473 U.S. 531, 542, 105 S.Ct. 3304, 3311, 87 L.Ed.2d 381, 392 (1985) (applying *Sharpe;* again rejecting *per se* time limits; and, holding that a *16 hour* detention was reasonable under the circumstances of that case).

We find that the initial two hour detention was reasonable under the facts of the instant case. The detention occurred at the scene of a *fatal* automobile accident. Following his initial encounter with appellee, the investigating officer knew that appellee was one of the drivers involved in the accident, and that appellee appeared glassy-eyed and had an odor of alcohol about his person. While these facts clearly gave rise to reasonable suspicion that appellee may have committed a traffic offense, i.e. homicide by vehicle while driving under the influence, they did not establish

probable cause for arrest.[6] Appellee was asked to remain. Appellee agreed to remain, and so the investigating officer went back to his initial accident investigation. There is no indication in the record that the investigating officer was less than diligent in pursuing the initial accident investigation or that he delayed its completion in any way. Moreover, it is important to note that both the Commonwealth and appellee had a strong interest in having a prompt, thorough accident investigation completed. Any delay on the part of the investigating officer in conducting the on-site investigation could have resulted in the loss of eye-witnesses, valuable physical evidence, or measurements which could either confirm *or dispel* suspicions that appellee was criminally responsible for the fatal accident. Moreover, the conditions of the detention also demonstrate its investigative rather than custodial nature. Appellee was "asked" to remain, and the only other restraint imposed was that the officer looked over at appellee occasionally. No prolonged interrogation took place. Appellee was not told he was under arrest or even suspected of a particular crime. Appellee was not transported anywhere against his will; nor is there any indication in the record that he was subjected to a show, threat, or use of force.

Following the completion of the initial accident investigation, the investigating officer *asked* appellee if he would submit to a breathalyzer test.[7] Appellee responded that he had no objections to taking a breathalyzer test. Accordingly, appellee was transported to the police barracks in order for the test to be administered. He was not subjected to

6. We note that there is *no* indication in the record that any additional indicia of intoxication were observed by the officer. *See Commonwealth v. Leninsky,* 360 Pa.Super. 49, 59, 519 A.2d 984, 990 n. 6 (1986) (noting nine common signs or symptoms of alcohol intoxication). Even assuming that the alleged admission of appellee's consumption of a "few beers" was available to the officer at this juncture, we would not find sufficient evidence to establish probable cause to believe appellee was intoxicated. *See generally Harvey v. Doliner,* 399 Pa. 356, 360–63, 160 A.2d 562, 565–66 (1960) (per Musmanno, J.; discussing testimony regarding alcohol consumption and intoxication).

7. *See* 75 Pa.C.S.A. § 1547(a)(2); *see also Commonwealth v. Pelkey,* 349 Pa.Super. 373, 503 A.2d 414 (1985).

undue restraints (*e.g.* handcuffs), and was not subjected to interrogation during this detention. Rather, appellee was merely escorted to a police testing facility in order to obtain highly evanescent evidence which was needed to confirm *or dispel* reasonable suspicions that appellee may have been criminally responsible for the fatal automobile accident.

We note that while a lawful *arrest* is ordinarily required before a suspect may be transported *against his will (see Commonwealth v. Lovette, supra; Common-wealth v. Quarles, supra* ), such an arrest is unnecessary when the suspect *actually,* as opposed to *impliedly* (75 Pa.C.S.A. § 1547), consents to being transported. *See Commonwealth v. Kelly,* 235 Pa.Super. 299, 301–04, 341 A.2d 141, 143–44 (1975); *see also Commonwealth v. Ebert,* 31 Pa.Cmwlth. 82, 86–88, 375 A.2d 837, 839 (1977). There is no evidence in the present record to indicate that appellee's consent was coerced. *See Commonwealth v. Kelly, supra,* 341 A.2d at 143–44 (no indication in the record that the suspect's consent to take a breathalyzer was coerced; coercion will not be implied); *see also Commonwealth v. Watkins,* 236 Pa.Super. 397, 398, 344 A.2d 678, 679 (1975) (same). Consistent with other cases involving the *consensual* transportation of a suspect for questioning, testing, or confirming of answers given to allay suspicions, we find that the detention arising from the consensual transportation of appellee to the police barracks for a breathalyzer test did not constitute a custodial detention or arrest. *Cf. Commonweath v. Haggerty,* 495 Pa. 612, 435 A.2d 174 (1981) (suspect consented to being transported to the police barracks to answer questions, then to take a polygraph test; detention did not become custodial until after admissions of guilt were made during polygraph test); *Commonwealth v. Petrino,* 332 Pa.Super. 13, 480 A.2d 1160 (1984) (suspect consented to be transported to hotel where his identity could be confirmed; detention did not become custodial until evidence establishing probable cause was discovered at the hotel); *Commonwealth v. Benson,* 317 Pa.Super. 139, 463 A.2d 1123 (1983) (suspect consented to being transported to

police station for questioning; detention did not become custodial until admissions of guilt were made).[8]

When the police determined that the breathalyzer results were invalid, the investigating officer requested that appellee accompany him to the hospital and submit to a blood test; appellee consented. At the hospital necessary forms were filled out and appellee again consented to the testing. (N.T. 9/29/86 at 10). Appellee was permitted to call his wife in order for her to drive him home after the blood test was completed. After appellee's wife's arrival and before the test was taken, appellee was given *Miranda* warnings.[9] Appellee was, in fact, permitted to leave with his wife after the blood test was completed.[10]

Taking the three and one half hour detention as a whole, we find that appellee's detention was investigative rather than custodial. The interests of appellee and the Commonwealth both required prompt action in a swiftly developing situation in order to preserve vital evidence which could either confirm or dispel reasonable suspicions that appellee may have been criminally responsible for the fatal automobile accident in which appellee was involved. Given the gravity of the situation, the three and one half hour deten-

8. These cases should not be construed, however, to suggest that the fact of arrest depends upon the existence of probable cause; assuredly it does not. Rather, these cases stand for the limited proposition that a consensual or otherwise reasonable investigative detention becomes a custodial detention when admissions are made or evidence is discovered which clearly establish probable cause and which renders formal arrest both imminent and inevitable.

9. We note that the mere giving of *Miranda* warnings does not render an investigative detention custodial. *See Commonwealth v. Haggerty, supra,* 435 A.2d at 175. This is especially true when, as in the instant case, appellee has conceded that after he was permitted to call his wife (before the warnings were given), he knew he was going to be permitted to go home after the blood test was taken.

10. We also note that while the blood test preserved the highly evanescent evidence, the results were not available that evening to confirm or dispel the investigating officer's reasonable suspicions; accordingly, the officer elected to wait until the results of the blood test were available before deciding whether to file charges against appellee. Under the circumstances, this decision was reasonable. Indeed, the present record does not disclose probable cause for arrest at that juncture; and therefore, no valid arrest could have been made.

tion does not seem excessive, especially in view of the complete absence of unnecessary restraints or coercive interrogation and the presence of cooperation and consent by appellee throughout. Accordingly, we find that appellee was not "arrested" for the purposes of Pa.R.Crim.P. 130 on the night of the accident. Therefore, the trial court erred in concluding that Pa.R.Crim.P. 130(d) applied and had been violated.

## II.

The Commonwealth also contends that assuming, *arguendo*, Pa.R.Crim.P. 130(d) applied, the trial court erred in its calculation of the five day run date by failing to exclude weekend days in accordance with 1 Pa.C.S.A. § 1908. At the suppression hearing, the investigating officer testified:

Q. But in any case, you waited until the 19th to file the charges, right?

A. Yes, sir.

Q. Why did you pick the 19th?

A. I wanted to file within the five days as required. It's the interpretation—my interpretation that week days are the—are considered within the five days; however, if the 5th day rests on a weekend or holiday, as I said this is my interpretation, that day does not count and carries over to the next day. However, I cannot understand why that would be prejudicial.

(N.T. 9/29/86 at 26). Had the trial court adopted this construction of the rule, the complaint would have been deemed timely. It did not; and so, the Commonwealth urges this construction of the rule as grounds for reversal on appeal. Appellee responds that this issue has been waived because the Commonwealth did not address this alternate theory in its brief to the trial court.

Because of our disposition of the Commonwealth's first contention, we need not resolve the waiver issue. We note in passing, however, that the investigating officer's construction of Pa.R.Crim.P. 130(d) is consistent with the con-

struction given the rule by this Court in *Commonwealth v. Oeler*, 357 Pa.Super. 281, 515 A.2d 977 (1986), which was subsequently approved and applied in *Commonwealth v. Revtai*, 516 Pa. 53, 73 & n. 9, 532 A.2d 1, 10 & n. 9 (1987).

## CONCLUSION

Based on the foregoing, the order of the trial court is vacated, the charges against appellee are reinstated, and the case is remanded for further proceedings not inconsistent with this opinion. Jurisdiction of this Court is relinquished.

WIEAND and POPOVICH, JJ., concur in the result.