## Commonwealth v. Johnson

*J. Wesley Rowden, assistant district attorney,* for the Commonwealth.

*Stephen Hall,* for defendant.

VARDARO, *J.,* June 19, 1992—Defendant has filed an omnibus pre-trial motion requesting that certain evidence be suppressed as well as alleged illegal statements obtained as a result of an illegal detention following a search of the defendant's person. A full hearing was held and now pursuant to Pa.R.Crim.P. 323(i) we make the following findings of fact and conclusions of law.

### FACTS

During the early morning hours of January 31, 1992, James A. Johnson, the father of the defendant, was apparently shot once or twice in the arm by a small caliber pistol. The police were called and the senior Johnson advised them that he had been robbed in a convenience store parking lot by one black man and one white man and during the ensuing struggle had been shot.

Apparently, the initial investigation by the police indicated that the senior Johnson was not telling the truth about where he had been shot. That indication, although vague in the record, apparently came from the fact that police officers investigating found a couple of .22 caliber shells on some steps at the residence of the senior Johnson, and his girlfriend, Mary Beth Daugherty, apparently had given the police some indication that the shooting had occurred other than where the victim had indicated.

When Detective Sergeant David Acker came on duty at 8:30 in the morning, he received the shooting case to investigate as part of his normal duties. The information he received included the reports of the officers who had investigated the matter earlier in the morning.

As part of his investigation, Sgt. Acker wanted to talk to the son of the victim, James Earl Johnson, the defendant in this matter. Acker set out to find the defendant on the morning of January 31, 1992. Acker testified that in doing so he did not consider the defendant to be a suspect in the shooting and had no reason at all to believe that the defendant had been involved in the same. Apparently the defendant resided in the same household as the shooting victim and Acker's interest in questioning him revolved around that fact.

During the course of his travels in an unmarked police vehicle through the city of Meadville, Acker spotted the defendant walking with another individual near the intersection of Poplar and Liberty Streets. He turned around but by the time he got back they had disappeared. At that point, Det. Acker radioed to other officers to attempt to locate the defendant and his companion.

Ultimately, shortly thereafter Acker again found the pair walking near Autumn Drive a few blocks from where they were initially spotted.

Acker indicated that both individuals had jackets on and their hands were in their jackets on this winter day when the temperature was about 30 to 40 degrees.

The detective pulled up just behind the pair on Autumn Drive and opened his door indicating to the defendant that he wanted him to stop so that he could ask him some questions about his father's shooting.

Det. Acker clearly indicated in his testimony that his intention was to just stop the defendant to ask him questions with regard to the shooting and he had no intention of taking him to the station nor did he have any basis to arrest or detain him at that point.

There were some words exchanged between Acker and the defendant although the various witnesses don't agree on exactly what was said. What is clear is that, either after stopping momentarily or possibly not stopping 'at all, the defendant made it clear that he was not interested in talking to Acker and proceeded to continue to walk away from where the officer had stopped.

By that time, another police unit had pulled up and was in a position to block the movement of the defendant and Acker called to that officer (Patrolman Cox) to stop the defendant and to frisk him.[1]

Initially, the defendant started to move away from Cox but never actually began running and was easily caught by the arm by Cox and escorted back to a police cruiser. Cox indicated that once the defendant was in his custody, the defendant did, on at least two occasions, make a movement for the inside left pocket of his jacket. Cox testified

---

1. In his testimony, Det. Sgt. Acker clearly remembers calling out to Patrolman Cox while Patrolman Cox did not remember Acker calling out.

that he was concerned that the defendant may have a small caliber weapon in his coat since a small caliber weapon had been used in the shooting of the defendant's father.

Once led back to the police cruiser, Cox indicated that the defendant was not free to leave and he proceeded to frisk the defendant. In doing so, he removed a pouch from his left coat pocket. The defendant was placed in the police cruiser without being handcuffed and the pouch along with other items taken from his pockets were on the hood of the police cruiser. The officer testified that defendant would have been unable to leave the back of the cruiser once he was in it unless the door was opened from outside.

Patrolman Cox proceeded to open the pouch and inside were various items including a small amount of marijuana and 23 rocks of crack cocaine in a clear vial.

At that point, the defendant was placed under arrest for possession of those illegal drugs and ultimately he was interviewed at the police station. The record is not clear as to whether he ever gave any incriminating statements but the defendant's motion to suppress in this matter requests that any statements he may have made as a result of his alleged illegal detention by the police officer be suppressed to the extent that they were incriminating.

## DISCUSSION

The Commonwealth bears the burden of going forward and the burden of establishing by a preponderance of the evidence that the challenged evidence was not obtained in violation of the rights of the accused. Pa.R.Crim.P.

323(h); *Commonwealth v. Ravenell,* 448 Pa. 162, 292 A.2d 365 (1972).

The initial encounter with the defendant in this matter is what has been described as a "mere encounter" by Pennsylvania courts. *Commonwealth v. Douglass,* 372 Pa. Super. 227, 539 A.2d 412 (1988). In order to question a person as Det. Acker started to do in this matter, such an encounter need not be supported by any level suspicion but it likewise carries no official compulsion to stop or to respond. *Commonwealth v. Douglass, supra,* at 238, 539 A.2d at 417; *Florida v. Royer,* 460 U.S. 491, 102 S.Ct. 1319, 75 L.Ed.2d 229 (1983). When the defendant refused to stop and talk to the officer, it is clear through the actions of the officers that it quickly became an investigatory stop or detention within the meaning of *Terry v. Ohio,* 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968), and the various cases that have followed.

Recently, the Pennsylvania Superior Court in *Commonwealth v. Martinez,* 403 Pa. Super. 125, 588 A.2d 513 (1991), *allocatur denied,* 608 A.2d 29, clearly set forth the standard for making an investigatory stop in the Commonwealth.

The court said that in doing so the officer must rely on specific and articulable facts, which if taken together with rational inferences from those facts, reasonably warrant a belief that criminal activity is afoot before an initial stop can lawfully be made. The police officer's reasonable and articulable belief that criminal activity was afoot must be linked with his observation of suspicious or irregular behavior on the part of the individual stopped. Furthermore, mere flight from police officers without more is

insufficient to support an investigatory stop. *Commonwealth v. Peagram*, 450 Pa. 590, 593, 301 A.2d 695, 697 (1973).

Additionally, a police officer is entitled to conduct a limited search of an individual to detect weapons if the officer observes unusual and suspicious conduct on the part of the individual which leads the officer to reasonably believe that criminal activity is afoot and that the person may be armed and dangerous. *Terry v. Ohio, supra; Commonwealth v. Martinez, supra; Commonwealth v. Lagana*, 517 Pa. 371, 376, 537 A.2d 1351, 1354 (1988).

The facts on which the police officer bases his decision must be within his knowledge at the time he initiates the stop and facts he ascertained after initiating the stop cannot be considered in determining whether his beliefs were reasonable at the time he initiated the stop. *Commonwealth v. Kearney*, 411 Pa. Super. 274, 601 A.2d 346 (1992), citing *Commonwealth v. Jones*, 474 Pa. 364, 378 A.2d 835 (1977); *Commonwealth v. Espada*, 364 Pa. Super. 604, 528 A.2d 968 (1987).

At the time the defendant was stopped, it is clear that Det. Acker only wished to question him regarding his father's shooting but that he was not a suspect in that shooting. The officer basically indicated that, because he did not want to talk to the officer, the conclusion was reached in Acker's mind that maybe he had some involvement in the crime and because a small caliber weapon was involved, that weapon may be on the person of the defendant. Essentially based on that information, Acker told Patrolman Cox to stop and frisk the defendant.

Cox, on the other hand, said he made the decision himself based on the fact that he knew the shooting had

occurred and that Acker wanted to question the defendant and the defendant was leaving the area when Acker attempted to question him.

Based on the police officer's articulable facts as well as any rational inferences, we do not believe that they could have reasonably concluded that criminal activity was afoot nor do we believe that they could have reasonably believed that the defendant may be armed and dangerous. The defendant has a right not to talk to the police officers and the fact he did so and walked away could not be used to arrive at a conclusion that he was involved in some type of criminal activity (specifically in this case the shooting of his father).

The police officers had not seen any evidence of a gun on the person of the defendant nor had they seen a bulge or anything that would indicate he had a gun on his person prior to initiating the stop. Apparently he reached into his left coat pocket a couple of times after the initial decision was made to stop him but those facts cannot even be taken into account because the stop had already been initiated.

Accordingly, we do not think that the investigative detention nor the subsequent search was proper and we have previously entered our order suppressing the evidence and any statements obtained as a result of that evidence being obtained.[2]

---

2. In light of this conclusion, we do not reach a decision with respect to further issues including whether the officer had a right to open the pouch once it was obtained from the defendant, had it been obtained legally.