**Commonwealth v. Shipp**

C.P. of Monroe County, no. 933 Criminal 1995.

*Lisa Green,* for Commonwealth.
*Brian Germano,* for defendant.

CHESLOCK, *J.,* March 27, 1996—On September 19, 1995, defendant was arrested and charged with one count of possession of a controlled substance, (35 P.S.

§780-113(a)(16)), and one count of possession of a small amount of marijuana, (35 P.S. §780-113(a)(31)). On December 26, 1995, defendant was arraigned and pled not guilty to these charges.

On January 26, 1996, defendant filed a pre-trial omnibus motion. In his motion, defendant requests that certain items be suppressed which were taken from him during an allegedly illegal search and seizure. Moreover, defendant requests that the oral statements that he made to the state police be suppressed as they are the result of this illegal search and seizure. A hearing was held before this court on February 29, 1996 and briefs have been received from defendant and the Commonwealth. Defendant did not appear at this hearing, but his counsel was present. We are now ready to address defendant's pre-trial omnibus motion.

At the hearing held on February 29, 1996, Trooper Gregory Miller of the Pennsylvania State Police testified that on September 19, 1995, he was assigned to intercept drug traffic coming through the Delaware Water Gap Toll Plaza. (N.T. 2/29/96, p. 6.) Trooper Miller was accompanied by a dog from the canine unit and another trooper, Trooper Casciano. (N.T. 2/29/96, p. 7.) At one point, a Toyota Camry with a Maryland license plate came through the toll plaza. (N.T. 2/29/96, p. 7.) Trooper Miller testified that he pulled this car over because the driver was not wearing a seat belt and because the right rear taillight was inoperable. (N.T. 2/29/96, p. 7.) The car was being driven by defendant. (N.T. 2/29/96, p. 7.)

Trooper Miller approached the car and asked defendant for his driver's license and the car's registration. (N.T. 2/29/96, p. 8.) Defendant gave Trooper Miller his license and Erica Lynn Herring, a passenger in the car and the car's owner, gave Trooper Miller the reg-

istration. (N.T. 2/29/96, p. 8.) Trooper Miller then returned to his patrol car and wrote a warning out for defendant. (N.T. 2/29/96, p. 9.) Trooper Miller then returned to the Camry and asked defendant to exit the vehicle. (N.T. 2/29/96, p. 9.)

Defendant exited the vehicle and then signed for the copy of the warning given to him by Trooper Miller. (N.T. 2/29/96, p. 9.) Trooper Miller then returned all of the papers to defendant. (N.T. 2/29/96, p. 9.) Defendant started walking back to the car. (N.T. 2/29/96, p. 9.) Trooper Miller asked him if he would mind answering a few questions. (N.T. 2/29/96, p. 9.) Defendant said that he would not mind. (N.T. 2/29/96, p. 9.) Trooper Miller then asked defendant a few questions regarding his destination and the origin of his trip. (N.T. 2/29/96, p. 9.) Defendant answered that he was coming from West Haven, Connecticut and was on his way to Cleveland, Ohio. (N.T. 2/29/96, p. 9.) Trooper Miller testified that defendant was "visibly shaken" during their conversation. (N.T. 2/29/96, p. 10.) He noticed that defendant's hands were shaking and that the passenger had smoked two cigarettes in the time that Trooper Miller had spoken to defendant. (N.T. 2/29/96, p. 10.)

Trooper Miller walked around to the other side of the vehicle and spoke to the passenger. (N.T. 2/29/96, p. 10.) Trooper Miller asked her the same questions that he asked defendant. (N.T. 2/29/96, p. 11.) Ms. Herring told Trooper Miller that she was traveling with defendant from West Haven, Connecticut to Cleveland, Ohio. (N.T. 2/29/96, p. 11.) Trooper Miller then asked her if she had been in New York City. (N.T. 2/29/96, p. 12.) Trooper Miller testified that Ms. Herring became more nervous and would not look at him. (N.T. 2/29/96,

p. 12.) Ms. Herring told the trooper that, if she had been in New York City, she was sleeping and "would not know anything about it." (N.T. 2/29/96, p. 12.)

At one point, the following statements were made:

"The Commonwealth: Now, going back a little bit, was there anything about the defendant and the passenger, based on your experience and training in drug interdiction, that made you suspicious?

"Trooper Miller: In particular, the statements that were given to me by—by both of them, and also, the deceptive the statement that was given to me the female passenger. I felt was a deceptive statement. Also, the interstate travel, and that's—that's about all." (N.T. 2/29/96, p. 12.)

Trooper Miller also testified that he was made suspicious by the fact that defendant and Ms. Herring seemed very nervous. (N.T. 2/29/96, p. 12.)

Next, Trooper Miller asked Ms. Henning for her consent to search the vehicle. (N.T. 2/29/96, p. 13.) Ms. Henning orally agreed to allow the search. (N.T. 2/29/96, p. 13.) Trooper Miller then asked all three passengers to exit the vehicle. (N.T. 2/29/96, p. 13.) Trooper Miller conducted a pat-down for weapons and as he was patting down defendant, he felt a hard, chunky substance in defendant's jeans pocket. (N.T. 2/29/96, p. 13.) Trooper Miller recognized this as drugs and removed it from defendant's pocket. (N.T. 2/29/96, p. 14.) Defendant was placed under arrest and Trooper Miller directed the canine to sniff the interior of the Camry. (N.T. 2/29/96, p. 14.) The canine located more drugs in Ms. Henning's car. (N.T. 2/29/96, p. 15.)

On cross-examination, Trooper Miller stated that on the day of defendant's arrest, he was wearing a uniform which had a state police patch on each shoulder and

a baseball cap which had a state police patch on it as well. (N.T. 2/29/96, p. 16.) Trooper Miller also testified that, after he gave the warning to defendant, defendant was free to leave. (N.T. 2/29/96, p. 17.) Furthermore, Trooper Miller testified to the following:

"Defendant's counsel: And everything that you detected by way of nervousness or smoking cigarettes occurred after he was free to leave, correct?

"Trooper Miller: All except for—all except for the part about his hands shaking. He was—I saw that before he was free to leave. After that, then all of the nervousness signals were after that, yes." (N.T. 2/29/96, p. 17.)

In reviewing defendant's motion to suppress, we recognize that, "It is incontrovertible that, here in Pennsylvania, the Commonwealth, and not defendant, has the initial burden of going forward with evidence and of establishing that the challenged evidence was not obtained in violation of defendant's rights." *Commonwealth v. Ryan,* 296 Pa. Super. 222, 228, 442 A.2d 739, 743 (1982).

Defendant primarily argues that he was unlawfully detained and was subject to an illegal search and seizure. Defendant argues that the fact that he and his passenger may have appeared nervous and had just been to New York City did not constitute reasonable suspicion for Trooper Miller to seize defendant and thereafter search his person and Ms. Henning's vehicle. Conversely, the Commonwealth argues that Trooper Miller's stop of defendant was a mere encounter and, therefore, it need not be supported by any level of suspicion.

The Commonwealth relies primarily on a Superior Court case which explains that, "A police encounter with a suspect may properly be characterized as a mere encounter, an investigative detention, a custodial de-

tention, or a formal arrest." *Commonwealth v. Douglass,* 372 Pa. Super. 227, 238, 539 A.2d 412, 417 (1988), *alloc. denied,* 520 Pa. 595, 552 A.2d 250 (1988). The court further stated that, "a 'mere encounter' (or request for information) need not be supported by any level of suspicion, but it carries no official compulsion to stop or to respond." *Id.* "An 'investigative detention' must be supported by reasonable suspicion; it subjects the suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest." *Id.* at 238-39, 539 A.2d at 418.

Defendant's motion to suppress presents a number of issues for this court to review, namely, we need to ask, "Was defendant detained and/or seized so as to trigger his Fourth Amendment rights?" Furthermore, if we decide that he was, in fact, detained, then we must ask, "Did Trooper Miller have reasonable suspicion to detain defendant?" Moreover, we must next decide if Ms. Henning's consent to the search of her car was valid and if Trooper Miller had reasonable suspicion to conduct a pat-down search of defendant.

First, we shall review the question of whether or not defendant was detained while Trooper Miller questioned him concerning his trip. The United States Supreme Court has held that any assessment as to whether police conduct amounts to a seizure implicating the federal Constitution's Fourth Amendment must take into account all the circumstances surrounding the incident in each individual case; the police can be said to have seized an individual only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565, 572 (1988).

The Pennsylvania Superior Court has stated that, "Only when the officer, by physical force or a show of authority, has in some way restrained the liberty of an individual may we conclude that a seizure has occurred." *Commonwealth v. Lidge,* 399 Pa. Super. 360, 366, 582 A.2d 383, 386 (1990), *alloc. denied,* 527 Pa. 598, 589 A.2d 689 (1991).

In the instant case, we find that when Trooper Miller asked defendant if he would mind answering a few questions, a reasonable person would not feel that he or she was free to leave. Defendant had just been pulled over for a traffic violation and had just received a formal warning from a Pennsylvania State Police trooper. This was not a mere encounter. Although Trooper Miller has testified to the court that defendant was free to leave once all of his papers had been returned, we doubt that a reasonable person would feel free to decline Trooper Miller's request for information. No doubt, if defendant refused to answer such questions, returned to his car and drove away, Trooper Miller would likely follow him and pull him over again. Defendant's refusal to answer any questions would likely raise Trooper Miller's suspicions even higher. Defendant had no real choice but to remain on the side of the interstate and answer Trooper Miller's inquiries.

Having found that defendant was seized within the meaning of the Fourth Amendment, we next must ask if Trooper Miller had reasonable suspicion to stop and detain defendant. The case of *Commonwealth v. Lopez,* 415 Pa. Super. 252, 609 A.2d 177 (1992), *alloc. denied,* 533 Pa. 598, 617 A.2d 1273 (1992), presented the Superior Court with facts similar to the instant case. In *Lopez,* the defendant was pulled over by a Pennsylvania state trooper because the tow-chains connecting his truck with his car were not properly crossed. *Id.* at 255-56,

609 A.2d at 179. The defendant gave the trooper his license and registration and was thereafter given a written warning by the trooper. *Id.* at 256, 609 A.2d at 179. The trooper did not, however, return the papers and proceeded to question defendant and a passenger concerning their destination and where they had been. *Id.* The passenger then consented to the search of the vehicle. *Id.* The trooper later testified that he became suspicious of the two travelers due to "policeman's intuition." *Id.* at 258, 609 A.2d at 180.

In its analysis, the Superior Court stated that the initial stop for the vehicle code violation was permissible. *Id.* The court also held that it was proper for the trooper to have asked defendant to exit the vehicle upon giving him the written warning. *Id.* at 259, 609 A.2d at 181. However, the court noted that:

"Corporal Martin admitted at the preliminary hearing that [t]his series of questions were unrelated to the purpose of the initial stop. Absent reasonable grounds to suspect an illegal transaction in drugs or other serious crime, the officer had no legitimate reason for detaining Lopez or for pursuing any further investigation of him, hence, the detention ceased to be lawful at this point." *Id.* at 262, 609 A.2d at 182.

The Superior Court ultimately ruled to exclude the drugs which were seized as a result of this unlawful search and seizure.

Even more specifically, in *United States v. Guzman,* 864 F.2d 1512 (10th Cir. 1988), the United States Court of Appeals stated that:

"An officer conducting a routine traffic stop may require a driver's license and vehicle registration, run a computer check, and issue a citation. When a driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on

his way without being subject to further delay by police for additional questioning." *Id.* at 1519.

Recently, this court granted a defendant's motion to suppress certain evidence seized from defendant. *Commonwealth v. Benzo,* Monroe County, no. 395 Criminal 1994. This decision to suppress was recently upheld by the Pennsylvania Superior Court. (Case no. 03764 Philadelphia 1994 (decided September 28, 1995)). In keeping with our past ruling, we find that, in the instant case, defendant was subject to an unreasonable search and seizure.

At the point that Trooper Miller asked defendant if he could ask him some questions, Trooper Miller had no reasonable suspicion to detain defendant and ask him questions. At that point in time, the only thing "suspicious" about defendant was the fact that he appeared nervous and he was driving a car with an out-of-state license plate. Upon questioning defendant and Ms. Henning, Trooper Miller testified that their answers were deceiving, yet failed to explain why these statements were misleading. Trooper Miller was also concerned by the fact that defendant had just come from New York City. We find that none of these factors constitute any type of reasonable suspicion which would warrant Trooper Miller's detention of defendant.

We recognize that Ms. Henning gave Trooper Miller verbal consent to search her automobile, however, we find that this consent was obtained as a result of an unlawful detention. In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the United States Supreme Court held that a consent to search is tainted if it is obtained as a result of an illegal detention and is therefore ineffective to justify the search. *Id.* at 243.

Next, we note that prior to searching Ms. Henning's vehicle, Trooper Miller conducted a pat-down search of all of the passengers of the car. Trooper Miller testified that he routinely does such a search in order to obtain any weapons that suspects may be carrying. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that a police officer needs reasonable suspicion in order to conduct a pat-down of an individual's body. In this case, there is no evidence that Trooper Miller had any reason to believe that defendant was in possession of a weapon and we therefore find that this pat-down was unlawful as well.

Lastly, we find that any statements made by defendant should be suppressed as they are "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

However, this court would like to express its disfavor with this order to suppress. It is being done with great reluctance, but it is being done in light of the principles established by the United States Constitution. The war on drugs is comprised of many difficult battles and we certainly understand and appreciate the effort being put forth by the Pennsylvania State Police to win this struggle. However, this court is bound to uphold the Constitution, no matter the circumstances.

Accordingly, we enter the following order:

## ORDER

And now, March 27, 1996, defendant's omnibus pre-trial motion is hereby granted. All evidence seized as a result of the search of defendant's person and Erica Lynn Henning's vehicle, as well as any statements made by defendant after the search shall be suppressed.