567 A.2d 1074

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Christopher A. HAUPT.**

Superior Court of Pennsylvania.

Submitted April 17, 1989.

Filed Dec. 11, 1989.

W. Jeffrey Yates, Bellefonte, for appellant.

Joseph P. Green, Bellefonte, for appellee.

Before TAMILIA, POPOVICH and MELINSON, JJ.

MELINSON, Judge:

This is a Commonwealth appeal from the order of the Court of Common Pleas of Centre County granting Christopher A. Haupt's motion to suppress. The suppression court found that statements Haupt made in response to a state trooper's questions were obtained during a custodial interrogation without Haupt having the benefit of having his *Miranda* [1] rights read to him. Thus, the court suppressed his statements. The court also suppressed the information the trooper obtained from the serial number on a revolver found in Haupt's car as "fruit of the poisonous tree." The Commonwealth has certified in good faith that the granting of this motion substantially handicaps and effectively terminates its prosecution of Haupt on the charge of carrying a firearm without a license. 18 Pa.C.S.A. § 6106(a). We reverse.

In reviewing the findings of a suppression court where the Commonwealth is appealing, we must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution, as read in the context of the record as a whole, that remains uncontradicted. *Commonwealth v. Lagana*, 517 Pa. 371, 375–376, 537 A.2d 1351,

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requires police to advise an individual of the following rights prior to any custodial interrogation: right to remain silent; anything said could be used against him in court; right to speak to an attorney of his own choice before questioning; if he could not afford an attorney, and he wanted one, the police would provide him with one free of charge before questioning; and, if willing to give a statement, he could stop at any time.

1353 (1988). While we are bound by the court's findings of facts if supported by the record, we are not bound by the court's legal conclusions which are drawn from the case. *Id.*

A suppression hearing was held before the Honorable Charles C. Brown, Jr., President Judge of the Court of Common Pleas of Centre County, on January 19, 1988. The only testimony presented was from Pennsylvania State Trooper David Toohey. Trooper Toohey's testimony, as recounted by the suppression court, was as follows:

On August 6, 1987, Trooper David Toohey of the Pennsylvania State Police initiated a traffic stop because of a faulty exhaust system on Defendant's vehicle. When the trooper approached Defendant's vehicle, he noticed on the seat next to Defendant was a revolver in its holster. [sic] Upon seeing the revolver, Trooper Toohey ordered Defendant out of the car and up against the front of the vehicle. Defendant was ordered to remain in that position while the trooper inspected the gun and obtained its serial number.

During this time, the trooper also asked Defendant questions concerning his reasons for having the gun in the car, as well as whether Defendant had the proper permits for the gun.

Defendant was not placed under arrest at this time, nor was he read his *Miranda* rights.

■ Upon review of the transcript of the suppression hearing we are compelled to note several important omissions from the suppression court's summary of the salient facts. First, it is uncontested that Trooper Toohey stopped Haupt because he reasonably believed that a provision of the Motor Vehicle Code was being violated. Such a stop is clearly permissible. 75 Pa.C.S.A. § 6308; *Commonwealth v. Elliott*, 376 Pa.Super. 536, 546 A.2d 654 (1988). Trooper Toohey also testified that he ordered Haupt out of his automobile in order to separate Haupt from the revolver. Then Trooper Toohey asked Haupt if he had a license to carry a firearm. Haupt responded that he had hunting and

fishing licenses [2] but did not have a license to carry a firearm in a vehicle or concealed on or about his body.[3] After removing the weapon from the vehicle, Trooper Toohey checked to see if it was loaded. He also radioed the police station in order to check the firearm's serial number to determine if it was stolen. After verifying that the weapon was not stolen, the officer issued a written warning for the motor vehicle violation and returned the firearm to Haupt. Haupt was not arrested.

Subsequent investigation revealed that the firearm was registered to Dawn Summers, Haupt's sister. Toohey verified Haupt's representation that he held valid hunting and fishing permits and that he was not licensed to carry a firearm pursuant to 18 Pa.C.S.A. § 6109. Thereafter, the instant complaint was initiated.

The suppression court rejected the Commonwealth's assertion that *Miranda* warnings were not necessary because this was a *Terry* stop. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Instead, the court found Trooper Toohey "was not justified in ordering Defendant out of, and up against, the car for a frisk without such belief [that criminal activity was underway] based upon 'specific and articulable facts indicating that the person frisked is armed and dangerous.'" *See Commonwealth v. Espada,* 364 Pa.Super. 604, 528 A.2d 968 (1987).

A similar issue was recently addressed by this court in *Commonwealth v. Elliott,* 376 Pa.Super. 536, 546 A.2d 654 (1988). In *Elliott,* a Pennsylvania State Trooper stopped Elliott's automobile for a violation of the Motor Vehicle Code. The Trooper approached Elliott and asked for his operator's license and registration card. Then the Trooper observed a bag of ice with beer in it located behind the passenger's seat where a second individual, Ray, was seated. Suspecting that Ray was underage, the Trooper asked him for identification. Ray had no identification, but informed the officer that he was nineteen (19) years old. The

**2.** *See* 18 Pa.C.S.A. § 6106(b)(9).

**3.** *See* 18 Pa.C.S.A. § 6109.

Trooper then asked Ray to step outside the vehicle. The trial court found that while the initial stop of the vehicle for a suspected Motor Vehicle Code violation was reasonable, the officer's ordering Ray, a passenger, out of the vehicle constituted an unreasonable intrusion on his personal security. As a result, the trial court suppressed all evidence obtained after Ray was ordered from the vehicle as "fruit of the poisonous tree."

In reversing the trial court, this court reviewed the United States Supreme Court's holding in *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam). The *Mimms* court held that out of a concern for the safety of the police, officers may, consistent with the Fourth Amendment, exercise their discretion to require a driver who commits a traffic violation to exit the vehicle even though they lack any particularized reason for believing the driver possesses a weapon. The *Elliott* court stated:

> The fact that Trooper Heckman admittedly did not think that Ray was armed and dangerous is of no consequence to our finding that the order to get out of the car was reasonable. The *Mimms* case makes clear that the officer need not articulate any reason for ordering the driver from the vehicle when the vehicle is lawfully detained for a traffic violation. Indeed, the officer in *Mimms* could articulate *no reason for* ordering Mimms out of his vehicle. It was merely his practice to order the occupants out of the vehicle as a matter of course during a traffic stop. The suppression court's confusion results from a failure to differentiate between the order to exit and the subsequent frisk of the defendant.... *Mimms* clearly holds that 'officers may, consistent with the Fourth Amendment, exercise their discretion to require a driver who commits a traffic violation to exit the vehicle even though they lack any particularized reason for believing the driver possesses a weapon.' [Citations omitted.] [4]

4. The *Elliott* court did not find it necessary to extend the holding in *Mimms* to passengers under the facts of that case, but held that where

Reviewing the facts of the instant case in light of *Elliott* and *Mimms*, we find that, because Trooper Toohey had effectuated a valid traffic stop, his request that Haupt exit the vehicle was not violative of the Fourth Amendment.

Having determined that the trooper lawfully stopped and removed Haupt from his vehicle, we must next address ourselves to the legality of the *Terry* pat down for weapons. Once a stop is deemed reasonable for Fourth Amendment purposes, a police officer may frisk an individual to search for weapons if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. In reviewing such conduct, we must balance the nature and quality of the intrusion against the importance of the governmental interests alleged to justify the intrusion. *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

Again, we turn to *Pennsylvania v. Mimms, supra,* for guidance. Applying the standard enunciated in *Terry v. Ohio*, the *Mimms* Court held that "the bulge in the [defendant's] jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat-down.'" *Mimms*, 434 U.S. at 112, 98 S.Ct. at 334, 54 L.Ed.2d at 338. Similarly, in the case at bar we conclude that the trooper's view of the revolver on the front passenger seat of Haupt's vehicle was a circumstance under which any man of reasonable caution would have believed that his safety was in danger and would have conducted a frisk. The plain view observation of a weapon within the reach of the driver is at least as persuasive in this regard as the presence of a bulge in his pocket. Accordingly, when we balance the nature and quality of the intrusion (a pat-down

a police officer has lawfully stopped a vehicle for a traffic violation, the officer may order a passenger to alight from the vehicle when he has an articulable basis to believe that criminal activity is afoot without violating the Fourth Amendment. 376 Pa.Super. at 549, 546 A.2d at 660.

search) against the importance of the governmental interests alleged to justify the intrusion (the safety of police officers during motor vehicle stops), we conclude that the search here was permissible. *United States v. Place, supra.*

■ Next, we must determine whether Haupt's Fifth Amendment rights were violated when Trooper Toohey asked him questions during the course of this traffic stop. The suppression court held that Haupt had been subjected to a "custodial interrogation" without the requisite *Miranda* warning. As a result, Haupt's statements and the information obtained from the weapon's serial number were suppressed.

An encounter between police and a suspect may be described as a "mere encounter, an investigative detention, a custodial detention, or a formal arrest." *Commonwealth v. Douglass,* 372 Pa.Super. 227, 238, 539 A.2d 412, 417 (1988), citing 3 *LaFave, Search and Seizure,* §§ 9.1, 9.2 at 332–422 (1987) (discussing the genesis of the *Terry* stop and the limits of permissible investigative detention); *Commonwealth v. Ellis,* 379 Pa.Super. 337, 549 A.2d 1323 (1989). *Miranda* warnings are only required prior to custodial interrogations. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966); *see also Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). As this court stated in *Commonwealth v. Douglass, supra:*

> A "mere encounter" (or request for information) need not be supported by any level of suspicion, but it carries no official compulsion to stop or respond. An "investigative detention" must be supported by reasonable suspicion; it subjects the suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. A "custodial detention" must be supported by probable cause; it is deemed to arise when the conditions and/or duration of an investigating detention become so coercive as to be the functional equivalent of arrest. Formal arrest requires

probable cause, and needs no further definition. [Citations omitted.]

*Douglass,* 372 Pa.Super. at 238–39, 539 A.2d at 417–418.

In *Berkemer v. McCarty, supra,* the United States Supreme Court evaluated Fourth and Fifth Amendment concerns with regard to traffic stops.

> The usual traffic stop is more analogous to a so-called *'Terry* stop' than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose 'observations lead him to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person in order to 'investigate the circumstances that provoke that suspicion.' '[T]he stop and inquiry must be "reasonably related in scope to the justification for their initiation." ' Typically, this means that the officer may ask that detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obligated to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda.* The similarly non-coercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda.*

468 U.S. at 439, 104 S.Ct. at 3150, 82 L.Ed.2d at 334. (citations omitted.)

"The clear import of *Berkemer* is that traffic stops, like *Terry* stops, constitute *investigative* rather that *custodial* detentions, unless under the totality of the circumstances the conditions and duration of the detention become the functional equivalent of an arrest." *Commonwealth v. Ellis,* 379 Pa.Super. 337, 353, 549 A.2d 1323 (1988) (citation omitted, emphasis in original); *see also Pennsylvania v. Bruder,* 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988)

(a single police officer asking defendant a modest number of questions and requesting him to perform a simple balancing test at a location visible to passing motorists constitutes an ordinary traffic stop and does not involve custody for purposes of *Miranda*.) Thus, we must review the totality of the circumstances to determine whether facts existed which would elevate this traffic stop to the "functional equivalent of an arrest."

The suppression court, relying on the cross-examination testimony of Trooper Toohey that the officer would have detained Haupt if he had tried to leave, determined that Haupt was in custody. Trooper Toohey testified concerning the stop as follows:

Q. Trooper Toohey, you were asked on direct examination whether or not the defendant was free to go and you said that he was free to go in a limited nature. Could you tell me what those limitations were as you perceived them or what prompted you to answer the question that way?

A. Well, as to whether or not the individual could go back and physically handle the firearm, I was a little leery of that.

Q. So, number one, it would be fair to state that if he, from the position that he was in, moved toward the firearm you would have physically stopped him?

A. I probably would have blocked his path, yes, sir.

Q. Any other limitations?

A. He was free to say what he wanted or to more or less as I talked to him, I expected him to be in the area but if he would have taken off there wouldn't be much that I could do about it. [sic]

Q. In terms of the limitation of movement, was he free to get back into his car without explanation and start the car and drive off without you doing anything?

A. I was in the process of writing a written warning. I believe that had he taken off again, I would have stopped him again.

Q. So you would have pursued him if he left without your permission at that stage? I know you eventually released him. But at that stage.

A. In the process of issuing the warning, yes, sir.

Q. Was there a point in the sequence of these events that we could say you released him? In other words, you indicated to him that he could go and you were finished with whatever you were doing at that time?

A. When I returned the weapon to his possession and asked him to sign the written warning, yes.

Q. Did you permit him to get back into his car at that time?

A. He was permitted back into his vehicle prior to that.

Q. If he had gotten back into his vehicle and left, you would have pursued him, would you not?

A. As far as the traffic violation, yes.

\* \* \* \* \* \*

Q. You ordered him to get out of the car?

A. I believe I—quote—I ordered him to vacate the vehicle.

Q. And he complied with that order?

A. Yes, he did.

Q. And I'm picturing him now standing, opening the door and standing up and you give him further orders and instructions, didn't you?

A. Yes, sir. I believe I had him stand near the left front bumper, left front fender of the vehicle.

Q. You directed him to get out of the car. Of course, the door is open and then you directed him up to the left front fender of the automobile?

A. Yes, sir, placing the door between he and the weapon.

Q. That was to remove him from this weapon which was still on the bucket seat on the passenger's side?

A. That's correct.

Q. So now we've gotten out of the car pursuant to your order and also taken a couple of steps forward to the left front fender, correct?

A. I believe so, yes.

Q. Now, there also came a point where you had him, you put him on the left front fender with his leaning forward with his hands on the left front fender, did you not? [sic]

A. I believe as I entered the vehicle I didn't want any further gestures made. I'm in a vulnerable situation leaning into a vehicle.

* ⁂ ✝ ⁑ ＊ ＊

Q. So he wasn't quite free to do whatever he wanted to do or to leave at that point in time, was he?

A. I don't know what would have transpired if he had. I probably would have stopped him and talked to him and found out where he was going.

The testimony of Trooper Toohey describes a classic *Terry* stop. As this court reasoned in *Ellis, supra:*

> It is important to note, however, that while a "seizure" of a suspect by police triggers Fourth Amendment protections, it does not trigger *Miranda* rights under the Fifth Amendment. "Seizures" and "custody" are analytically distinct concepts in the modern criminal constitutional law lexicon. The mere fact that an individual is subjected to a stop and a period of detention during which the individual is subject to the control of the police and not free to leave (a seizure) does not render such detention "custodial" so as to require *Miranda* warnings. "While a suspect may certainly walk away from a mere encounter with a police officer, every traffic stop and every *Terry* stop involves a stop and period of time during which the suspect is not free to go but is subject to the control of the police officer detaining him." (citations omitted.)

379 Pa.Super. at 354, 549 A.2d at 1331.

Among the factors the court utilizes in determining whether the detention is custodial or investigative are: the basis for the detention; the duration; the location; whether the suspect was transported against his will, how far, and why; whether restraints were used; the show, threat, or

use of force; and the methods of investigation used to confirm or dispel suspicions. *Commonwealth v. Douglass,* 372 Pa.Super. at 245, 539 A.2d at 421.

In the instant case, the basis for the detention was a traffic violation; the duration of the stop was approximately fifteen (15) to twenty (20) minutes; and the location was a public street. Haupt was not transported; no restraints were used; and Trooper Toohey made no show, threat, or use of force. The trooper detained Haupt only for the period required to transmit his motor vehicle and weapon information, and issue a warning for the exhaust violation. The record reveals that the trooper asked a moderate number of questions to ascertain Haupt's identity and to try to "obtain information confirming or dispelling the officer's suspicions" that Haupt was committing a crime involving the weapon. *See Berkemer v. McCarty, supra; Pennsylvania v. Bruder, supra.* When Trooper Toohey satisfied himself that the answers given did not provide probable cause for arrest, Haupt was released. *See Berkemer v. McCarty, supra; Pennsylvania v. Bruder, supra.* Considering the totality of the circumstances of Haupt's detention, we find that the actions of the trooper constituted an investigative detention, and *Miranda* warnings were not required.

Order reversed. Jurisdiction relinquished.