J-A08043-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
GARY TOWNSEND :
:
Appellant : No. 910 EDA 2020

Appeal from the Judgment of Sentence Entered February 18, 2020
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0005195-2018

BEFORE:   PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED MAY 4, 2021**

Appellant Gary Townsend appeals from the judgment of sentence entered in the Court of Common Pleas of Montgomery County on February 18, 2020, following his convictions of Persons Not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms, 18 Pa.C.S.A. § 6105(a)(1); Firearms Not to Be Carried Without a License, 18 Pa.C.S.A. § 6106(a)(1); Possession of Controlled Substance, 35 P.S. § 780-113(a)(16) and Drug Paraphernalia, 35 P.S. § 780-113(a)(32). Appellant argues the trial court erred in denying his motion to suppress all evidence seized from an illegal traffic stop of a vehicle in which he was a backseat passenger on July 9, 2018. Following our review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

The trial court fully and correctly set forth the relevant facts and procedural history of this case in its Pa.R.A.P. 1925(a) Opinion; therefore, we need not restate them herein. *See* Trial Court Opinion, filed 7/31/2020, at 1-4. Briefly, on May 7, 2019, Appellant filed a suppression motion as part of his Omnibus Pre-Trial Motion. Therein, Appellant contended all evidence including a firearm and drugs resulting from the traffic stop must be suppressed as fruit of the poisonous tree because police lacked the requisite justification to perform the initial stop under 75 Pa.C.S.A. § 3331(b) of the Vehicle Code.[1] Following a suppression hearing on June 26, 2019, the suppression court denied Appellant's motion on August 7, 2019.

A stipulated bench trial was held on November 8, 2019. At the conclusion of trial, the trial court found Appellant guilty of the aforementioned charges and on February 18, 2020, sentenced Appellant to an aggregate term of five (5) years to ten (10) years in prison.

---

[1] This subsection provides:

> **(b) Left turn.--**The driver of a vehicle intending to turn left shall approach the turn in the extreme left-hand lane lawfully available to traffic moving in the direction of travel of the vehicle. Whenever practicable, the left turn shall be made to the left of the center of the intersection and so as to leave the intersection or location in the extreme left-hand lane lawfully available to traffic moving in the same direction as the vehicle on the roadway being entered.

75 Pa.C.S.A. § 3331(b).

Appellant filed a timely notice of appeal on March 11, 2020, and the trial court directed Appellant to file a concise statement of the matters complained of on appeal. Appellant filed his Rule 1925(b) Concise Statement on June 1, 2020, wherein he stated the following:

> 1. The officer who pulled over [Appellant] on July 9, 2018 did not have probable cause or reasonable suspicion to stop the vehicle in which [Appellant] was an occupant. (A non-investigable violation of the vehicle code requires probable cause to stop and there was otherwise no reasonable suspicion of any investigable crime to stop.) Thus, the car stop violated [Appellant's] 4th Amendment rights and all the evidence seized was the fruit of that poisonous stop.
>
> 2. The officer who pulled over [Appellant] on July 9, 2018 violated *Miranda*[2] by not reading [Appellant] his rights prior to asking him about whether the gun was licensed. Under *Hicks*,[3] the officer had no independent basis to seize the gun at [Appellant's] feet and thus the gun and all other evidence of a crime found based upon that violation of *Miranda* should have been suppressed.

In his appellate brief, Appellant presents the following questions for this Court's review.

> 1. Whether it was a violation of [Appellant's] Fourth Amendment rights for police to stop the car [Appellant] was a passenger in on July 9, 2018 when the stop was unsupported by probable cause.
>
> 2. Whether the officer who stopped the car [Appellant] was a passenger in on July 9, 2018 violated [Appellant's] Fourth Amendment rights, per *Hicks*, by prolonging the traffic stop without an independent basis, which ultimately also lead to a violation of [Appellant's] *Miranda* Rights.

Brief for Appellant at 3.

---

[2] ***Miranda v. Arizona***, 384 U.S. 436 (1966).
[3] ***Commonwealth v. Hicks***, 208 A.3d 916 (Pa. 2019).

In his brief, Appellant argues the statutory language of Subsection 3331(b) is too ambiguous to provide a driver with proper notice pertaining to what conduct is prohibited thereunder. Brief for Appellant at 15-19. Appellant posits the statute "is so poorly constructed that it is at best ambiguous and at worst contradictory. It does not provide driver's [sic] with notice of what conduct is prohibited; thus, it must be deemed void for vagueness." *Id*. at 19. Appellant also presents arguments pertaining to the "rule of lenity" and the PennDOT Manual in support of this assertion. *Id* at 20-22.

Notably, a comparison of both his concise statement and his appellate brief evinces that Appellant presents theories on appeal regarding the propriety of his traffic stop pursuant to Section 3331(b) that differ from those he raised before the trial court. Specifically, Appellant never alleged in his Concise Statement the unconstitutionality of Subsection 3331(b), or the applicability of the rule of lenity and the PennDOT Manual. It is well-settled that issues not included in a court-ordered concise statement are deemed waived on appeal. *See* Pa.R.A.P. 1925(b)(4)(vii); *see also Commonwealth v. Jones*, 191 A.3d 830, 834–835 (Pa.Super. 2018) (waiving defendant's challenge identification testimony on appeal under different theories than those previously raised in concise statement because trial court did not have opportunity to review those theories). Importantly, the fact that the trial court neither acknowledged nor considered these novel theories for relief is further evidence that Appellant did not present them for its review. Accordingly, we

conclude that to the extent Appellant develops arguments in support of these newly raised theories, they are waived.

We next consider Appellant's position presented in his Concise Statement that Officer Townsend lacked probable cause to stop the vehicle and that, therefore, his constitutional rights under *Miranda* and *Hicks* were violated as the stop was pretextual and the plain view exception was inapplicable. Brief for Appellant at 13-15, 22-32. When a defendant challenges the denial of a suppression motion, this Court's standard of review:

> is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial. *Commonwealth v. Yandmuri*, 639 Pa. 100, 159 A.3d 503, 516 (2017) (citations omitted). Additionally, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." *Commonwealth v. Byrd,* 185 A.3d 1015, 1019 (Pa.Super. 2018). (citation omitted).

> ***

> The quantum of cause required for a traffic stop is settled: If a police officer possesses reasonable suspicion that a violation of [Pennsylvania's Motor Vehicle Code (MVC)] is occurring or has occurred, he may stop the vehicle involved for the purpose of obtaining information necessary to enforce the provisions of the [MVC]. *See* 75 Pa.C.S.A. § 6308(b). Reasonable suspicion is a relatively low standard and depends on the information

possessed by police and its degree of reliability in the totality of the circumstances. *See Commonwealth v. Brown*, 606 Pa. 198, 996 A.2d 473, 477 (2010). In order to justify the stop, an officer must be able to point to specific and articulable facts which led him to reasonably suspect a violation of the MVC. *See Commonwealth v. Holmes*, 609 Pa. 1, 14 A.3d 89, 95 (2011). The standard for assessing whether a given set of observations constitutes reasonable suspicion is an objective one, based on the totality of the circumstances. *See id.*

*Commonwealth v. Wilson*, 237 A.3d 572, 578-79 (Pa.Super. 2020) (emphasis omitted).

However, we have further explained:

Mere reasonable suspicion will not justify a vehicle stop when the driver's detention cannot serve an investigatory purpose relevant to the suspected violation. ... If it is not necessary to stop the vehicle to establish that a violation of the [MVC] has occurred, an officer must possess **probable cause** to stop the vehicle.

*Salter*, 121 A.3d at 993 (emphasis added, citation omitted). To establish probable cause, the "officer must be able to articulate specific facts possessed by him at the time of the questioned stop, which would provide probable cause to believe that the vehicle or the driver was in some violation of some provision of the [MVC]." *Commonwealth v. Lindblom*, 854 A.2d 604, 607 (Pa.Super. 2004).

*Commonwealth v. Shaw*, 2021 WL 610152, at *2-3 (Pa.Super. Feb 21, 2021).

Here, Officer Ondarza testified he stopped the Volkswagen Jetta when the driver opted to cross the left-hand passing lane of the two lanes available and enter the right, non-passing lane of travel. Because the violation required no additional investigation, Appellant is correct that Officer Ondarza was required to have probable cause to initiate the traffic stop. *Brown*, *supra* 64

A.3d at 1105 **see also Commonwealth v. Tillery**, 2021 WL 1152409 at *6 (Pa.Super. March 26, 2021).

Mindful of the applicable standard of review, we have reviewed the certified record, the parties' briefs, the applicable law and the thorough and well-reasoned opinion issued by the Honorable Thomas C. Branca of the Court of Common Pleas of Montgomery County.  We conclude that Judge Branca's Opinion accurately and thoroughly disposes of the issues Appellant properly preserved for our review, and we discern no abuse of discretion or error of law.  **See** Trial Court Opinion, filed 7/31/20,  at 6-13 (finding: Officer Ondarza had probable cause to stop the vehicle following a violation of Section 3331; Officer Ondarza did not violate Appellant's **Miranda** rights by inquiring as to the licensure of a firearm located in plain view at Appellant's feet because Appellant was not subjected to a custodial detention when the officer observed the gun; Appellant's reliance for the first time at the suppression hearing upon **Hicks**, **supra**, affords him no relief).

Accordingly, we adopt Judge Branca's Opinion as our own with respect to the properly preserved issues Appellant raises on appeal and affirm the judgment of sentence on that basis.  We direct the parties to attach a copy of Judge Branca's Opinion in the event of future proceedings.

Judgment of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/04/2021</u>

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA   :       NO. 5195-18
                                     :         910 EDA 2020

            v.                              :

                                           :

GARY TOWNSEND                       :

**OPINION**

Branca, J.                                                     **July 31, 2020**

## I.    INTRODUCTION

Gary Townsend ("Defendant") appeals to the Superior Court from the judgment of sentence imposed on February 18, 2020.[1] For the reasons that follow, Defendant's appeal is without merit.

## II.    STATEMENT OF THE CASE

### A.    Factual History[2]

1.      On July 9, 2018, Officer Shane Ondarza ("Ofc. Ondarza") of the Limerick Township Police Department ("LTPD") was in full uniform, alone in his marked vehicle, on patrol in the area of Linfield Road and North Lewis Road, Limerick Township, Montgomery County.

2.      At approximately 12:58am, while driving through the parking lot of the Linfield Wawa, at a speed of approximately 10 mph, Ofc. Ondarza passed a black Volkswagen Jetta ("Jetta,") bearing PA registration KFH-4274.

3.      Ofc. Ondarza estimated that it took him approximately 30 seconds to drive by the Jetta, which was backed into a parking spot and occupied by a driver, front seat passenger, and rear passenger, Gary Townsend ("Defendant"). As he drove by, Ofc. Ondarza observed Defendant "abnormally fixated" on him and/or his patrol vehicle.[3]

4.      Ofc. Ondarza clarified his basis for characterizing Defendant's staring as 'abnormal,' stating, "[t]ypically, other occupants or operators, they'll acknowledge your presence, maybe smile, wave, maybe even look away from you. What Mr. Townsend did was immediately observe my presence, never acknowledge me with either a head nod, a smile, or a wave, but continued to stare at me for the entire period of time that I was in his sight."[4]

---

[1] [Disposition (2/18/20)].

[2] In denying Defendant's Motion to Suppress, the Court issued Findings of Fact which are set forth verbatim herein. These facts were elicited at a hearing before the Court on June 26, 2019.

[3] [N.T. 6/26/19, at 42-43].

[4] [N.T. 6/26/19, at 43].

5. After proceeding with a loop around the parking lot, and having concluded that Defendant intended to 'stare him down,' Ofc. Ondarza decided to follow the Jetta as it moved from its spot, signaled, and exited the lot on to Lindfield Road, traveling north toward North Lewis Road.

6. Intending to turn left onto North Lewis Road, the Jetta so signaled and approached the intersection in the extreme left-hand lane lawfully available to it.[5] Then, with Ofc. Ondarza following close behind in his patrol car and no other vehicles present in the intersection, or on either of the intersecting roadways, the Jetta operator [Ms. Ascher] opted to cross the left-hand passing lane of the two lanes available to it on North Lewis Road, and enter the right, non-passing lane of travel.[6]

7. Ofc. Ondarza closely followed the Jetta through the intersection, and maintained his position in the extreme-most left-hand lane of North Lewis Road, eventually switching into the right lane behind the Jetta. He proceeded to pursue the Jetta which initiated its right-hand turn signal approximately 30 seconds later, before turning right onto Linfield Trappe Road.

8. Ofc. Ondarza continued to follow the Jetta, turning right onto Linfield Trappe Road and activating his patrol unit's emergency lights moments later. The Jetta's operator promptly acknowledged Ofc. Ondarza's emergency lights by braking to slow her vehicle before signaling and safely pulling her vehicle to a complete stop moments later under the brightly illuminated and covered portico area directly in front of the entrance to a local Hampton Inn.

9. Outfitted with a 'dash cam' automatically enabled to pre-record video surveillance approximately 90 seconds prior to activation of its emergency lights, Ofc. Ondarza's patrol unit captured video footage of the Jetta from the time it signaled right, exiting the Wawa parking lot onto Linfield Road until the point in time when Ofc. Ondarza executed the traffic stop, and ultimately apprehended Defendant.[7]

10. Once stopped, Ofc. Ondarza parked directly behind the Jetta. Moments later, as he exited his patrol unit, its 'dash cam' began recording audio footage of the stop, as described below by Ofc. Ondarza:[8]

> Before I even actually made it up to the vehicle, the driver had her head out the window. She was questioning me about the reason for the stop. As I approached the vehicle, I just made her aware of who I was, introduced myself, stated the reason for the stop, and asked for her documentation.

11. Ofc. Ondarza explained to the operator that he had stopped her for "navigating an improper turn." Seeking clarification from the officer as to what was 'improper,' Ofc. Ondarza explained that, "when you make a turn, . . . in your case a left-hand turn, you have to turn into the nearest lane. You turned into the outside lane."[9]

12. In recalling how the stop then unfolded, Ofc. Ondarza continued:[10]

---

[5] *See* 75 Pa. C.S. § 3331(b).
[6] [N.T. 6/26/19, at 17-18].
[7] [Ex. CS-5 ("Video")].
[8] [N.T. 6/26/19, at 24-25].
[9] [N.T. 6/26/19, at 27, at Ex. CS-5 ("Video")].
[10] [N.T. 6/26/19, at 25].

2

As customary, I guess you would say, for any traffic stop, obviously, you're just being aware of your surroundings. There were multiple occupants of the vehicle. So, for officer safety purposes, I'm just looking in plain view to make sure there's no safety risk for myself or anyone else on the traffic stop.

13. It was then, less than a minute having passed from his initial encounter with the vehicle's operator, and while still speaking to the occupants, that Ofc. Ondarza looked down to observe in plain view what he believed to be a gun on the rear driver's side floor between Defendant's feet.[11]

14. It was later determined that the weapon Ofc. Ondarza had observed in plain view was a loaded Smith & Wesson 357 magnum revolver.

15. With his flashlight aimed on the object, Ofc. Ondarza asked Defendant 'what's that on the floor right there?'[12] Defendant hesitated, the front seat passenger asked 'what's what?', and then Defendant responded 'it's a lighter,' as he began to kick the firearm under the driver's side seat with his right foot.[13]

16. Instructing Defendant not to kick the weapon, Ofc. Ondarza asked him a second time what the object was whereupon he admitted that it was a gun.[14] Upon inquiry, Defendant denied having a permit, as well as ownership of the weapon.[15]

17. Upon learning of the presence of the gun in her car, the Jetta's operator began screaming expletives at both Defendant and the front seat passenger for bringing the weapon into her car without her knowledge. The atmosphere of what had been an initially calm and routine traffic stop immediately escalated by virtue of the presence of a gun and the operator's conduct. Recalling the scene, Ofc. Ondarza explained, "I never left the side of the vehicle. After seeing the firearm, separating myself from the vehicle for officer safety," was a risk, "so I wouldn't leave the presence of it. And it was within a minute of speaking with . . . [the operator] . . . that I observed the firearm."[16]

18. Ofc. Ondarza requested backup and then sought to maintain the status quo, until that backup arrived.[17] While awaiting its arrival, Ofc. Ondarza asked the other occupants if anyone had a license for the weapon, to which they responded collectively that they did not.

19. He followed up, asking the occupants to whom the gun belonged, and Defendant, notwithstanding being a person not to possess, assumed responsibility, while the front seat passenger interjected that she was 'holding' the firearm for Defendant.[18]

20. Once backup arrived within minutes, Ofc. Ondarza removed each of the occupants from the vehicle; Defendant first, as he was closest in proximity to the weapon. Officers then had Defendant stand with his hands on the front of Ofc. Ondarza's nearby patrol car while the investigation continued.

---

[11] [N.T. 6/26/19, at Ex. CS-3 (Photograph), at 27-30, at Ex. CS-5 ("Video") at 3:25].

[12] [N.T. 6/26/19, at Ex. CS-5 ("Video")].

[13] [N.T. 6/26/19, at 26].

[14] [Ex. CS-5 ("Video") at 3:32 (Defendant admitting object was a gun.)].

[15] [N.T. 6/26/19, at 26-27].

[16] [N.T. 6/26/19, at 29-30, at Ex. CS-5 ("Video")].

[17] [Ex. CS-5 ("Video") at 5:20 reflecting arrival of back-up].

[18] [N.T. 6/26/19, at 27-28].

3

21.     With the aid of the responding backup and the Montgomery County Emergency Dispatch Services, Ofc. Ondarza completed an on-scene records check of the weapon to determine that it belonged to either Defendant's father or grandfather.[19] In conversation with Ofc. Ondarza's colleague, Sgt. Cicak, Defendant told him that the gun was his father's, who willed it to him when he died.[20]

22.     Seeking to clarify Defendant's prior inconsistent responses as to the gun's ownership, Ofc. Ondarza elicited Defendant's explanation that he had initially denied ownership to avoid criminal liability, especially in light of his status as a 'person not to possess,' allowing his girlfriend in the front seat to accept responsibility, but that he felt he 'should take ownership of it because he's the man.'[21]

23.     In light of his statement, Defendant was taken into custody.

## B.     Procedural History

The Commonwealth ultimately charged Defendant with the following six (6) counts on Bill of Information 5195-18: Count One (Persons Not to Possess A Firearm), Count Two (Firearms Not to be Carried Without A License), Counts Three and Four (Possession of a Controlled Substance: Heroin), and Counts Five and Six (Possession of Drug Paraphernalia).[22]

On May 7, 2019, as part of his Omnibus pretrial Motion, Defendant sought suppression of all evidence seized, as well as any statements elicited from him, asserting that the officers lacked the requisite probable cause to stop the vehicle in which he was riding and/or arrest him.[23] At the time Defendant filed his Omnibus Motion, he asserted that his motion 'hinged on' the validity of the underling motor vehicle stop.[24] During the subsequent suppression hearing, however, defense counsel verbally asserted separate bases for suppression of Defendant's statements and/or admission(s); claiming such evidence was obtained in violation of both *Commonwealth v. Hicks* and *Miranda*.[25] After hearing and argument, the Court denied Defendant's Motion to Suppress by Order dated August 7, 2019.[26] On November 18, 2019, Defendant proceeded to a stipulated bench

---

[19] [N.T. 6/26/19, at 30].

[20] [N.T. 6/26/19, at 28].

[21] [N.T. 6/26/19, at 28-29].

[22] [Bill of Information; 5195-18 (11/8/18)]; *see* 18 Pa. C.S. §§ 6105(a)(1), 6106(a)(1), 35 Pa. C.S. § 780-113(a)(16), (a)(32).

[23] [Def.'s Omnibus Pre-Trial Mot., at ¶ 5 (5/7/19)]; [N.T. 6/26/19, at 3-10].

[24] [*Id.*].

[25] [N.T. 6/26/19, at 3-10, 49]; *see Commonwealth v. Hicks*, 208 A.3d 916 (Pa. 2019) (Abrogating *Commonwealth v. Robinson*, 600 A.2d 957 (Pa. Super. Ct. 1991), and holding that police officer may not infer criminal activity, of kind supporting a *Terry* stop, merely from an individual's possession of concealed firearm in public.)

[26] [Order (8/7/19)].

4

trial after which the Court found Defendant Guilty on each of the counts pursued by the Commonwealth: Counts One through Three and Count Five.[27]

On February 18, 2020, Defendant appeared before the Court for sentencing on the instant (new) file, and his Gagnon II hearing on case number CP-46-CR-0004592-2013; to which Defendant stipulated to being in violation.[28] After reviewing both the Presentence Investigation (PSI) report and Probation and Parole Intervention Evaluation (PPI), the Court sentenced Defendant to the following: on Count One (Persons Not to Possess Firearms (F1)), imprisonment for not less than five (5) years, nor more than ten (10) years, on Count Two (Firearms Not to be Carried Without A License (F3)) imprisonment for not less than two (2) years, nor more than four (4) years, on Count Three (Possession of a Controlled Substance-Heroin (M)) imprisonment for not less than sixteen (16) months, nor more than thirty-two (32) months, and on Count Five (Possession of Drug Paraphernalia (M)) imprisonment for not less than six (6) months, nor more than Twelve (12) months; all sentences running concurrently with each other.[29] [N.T. 8/5/13, at 64-65]. On March 11, 2020, Defendant filed a timely Notice of Appeal challenging the imposition of his sentence.

## III. ISSUES

On June 1, 2020, in response to the Court's Pa. R.A.P. 1925(b) request, Defendant timely filed his 1925(b) Concise Statement stating as follows:[30]

1. The officer who pulled over Mr. Townsend on July 9, 2018 did not have probable cause or reasonable suspicion to stop the vehicle in which Mr. Townsend was an occupant. (A non-investigable violation of the vehicle code requires probable cause to stop and there was otherwise no reasonable suspicion of any investigable crime to stop.) Thus, the car stop violation Mr. Townsend's 4th Amendment rights and all the evidence seized was the fruit of that poisonous stop.

2. The officer who pulled over Mr. Townsend on July 9, 2018 violated *Miranda* by not reading Mr. Townsend his rights prior to asking him about whether the gun was licensed. Under *Hicks*, the officer had no independent basis to seize the gun at Mr. Townsend's feet and thus the

---

[27] [N.T. 11/18/19 at 16-17]. The Commonwealth nol prossed Counts Four and Six.
[28] [N.T. 2/18/20, at 2].
[29] [N.T. 2/18/20, at 11-13, 26-31]; [Disposition, (2/18/20)]. The Court informed Defendant of his post-sentence rights, and Defendant filed no such post-sentence motion.
[30] [Def.'s 1925(b) Statement (6/1/20)].

5

gun and all other evidence of a crime found based upon that violation of *Miranda* should have been suppressed.

## IV. DISCUSSION

In reviewing the denial of a motion to suppress, the appellate court's responsibility is limited to determining whether the record supports the suppression court's factual findings and whether it reached its legal conclusions in error. *Commonwealth v. Arrington*, --- A.3d -- -, 2020 WL 3479782, at * (Pa. Super. Ct. June 9, 2020). The reviewing court will consider only the evidence of the Commonwealth and so much of the evidence for the defense which, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Harrell*, 65 A.3d 420, 433 (Pa. Super. Ct. 2013). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Elmobdy*, 823 A.2d 180, 183 (Pa. Super. Ct. 2003). As such, the suppression court is entitled "to believe all, part or none of the evidence presented." *Commonwealth v. Benton*, 655 A.2d 1030, 1032 (Pa. Super. Ct. 1995).

### A. The Court Properly Denied Defendant's Motion To Suppress Because Officers Had The Requisite Probable Cause To Conduct The Initial Vehicle Stop.

Defendant's first claim on appeal is that the Court should have suppressed all evidence seized by virtue of the stop because the apprehending officer allegedly lacked either probable cause or reasonable suspicion to support the vehicle stop. For the following reasons, Defendant's claims fail.

In Pennsylvania, a police officer has probable cause to stop a motor vehicle if the officer observes a traffic code violation, even if it is a minor offense. *Commonwealth v. Harris*, 176 A.3d 1009, 1019 (Pa. Super. Ct. 2017) (internal citation omitted). In relevant part, Title 75 of the Motor Vehicle Code, Section 3331, entitled 'Required position and method of turning,' provides:

> **(b) Left turn.**--The driver of a vehicle intending to turn left shall approach the turn in the extreme left-hand lane lawfully available to traffic moving in the direction of travel of the vehicle. Whenever practicable, the left turn shall be made to the left of the center of the intersection and so as to leave the intersection or location in the extreme left-hand lane lawfully available to traffic moving in the same direction as the vehicle on the roadway being entered.

6

75 Pa. C.S. § 3331(b). A careful reading of Section 3331(b) requires that a vehicle making a left-hand turn onto a four-lane road (*i.e.*, two lanes heading in the direction in which the vehicle is turning) execute the turn into the left-hand lane whenever practicable. In this case, the record reflects that no other traffic was present at the time in question, and as such, it was practicable to so navigate the turn. Additionally, administrative guidance by PennDOT further bolsters the interpretation above, providing as follows:[31]

> To turn left on multi-lane streets and highways, start from the left lane. . . . Turn into the left lane when making a left turn, and turn into the right lane when making a right turn. If you want to change to another lane, wait until you have safely completed your turn.

*See Turchi v. Phila. Bd. of License & Inspec. Review*, 20 A.3d 586 (Pa. Commw. Ct. 2011) (Administrative agency's statutory interpretation generally entitled to deference.) In *Commonwealth v. Arrington*, the Court upheld the trial court's suppression, based on its determination that the stop, precipitated by the observation of a motor vehicle violation (75 Pa. C. S. § 3301(a)), was appropriately supported by probable cause. *Id.* at *2-3. Similarly, in this case, based on the evidence presented, including Ofc. Ondarza's uninterrupted 'dash cam' footage, reflecting the operator's violation of the Motor Vehicle Code, especially in light of the absence of any other vehicular traffic obstructing her ability to so abide, demonstrate that Ofc. Ondarza possessed the necessary probable cause to initiate the traffic stop. *See* 75 Pa. C.S. § 3111(b). As such, the Court properly denied suppression and Defendant's instant claim on appeal fails.

### B. The Court Properly Denied Defendant's Motion To Suppress Because Defendant Was Not Subject To Custodial Detention When Officer Observed Firearm In Plain View.

Next, Defendant asserts that the Court should have suppressed all evidence seized, alleging that the officers violated *Miranda* by inquiring as to the licensure of the firearm located in plain view at Defendant's feet. Defendant's second claim on appeal, likewise, fails.

---

[31] [*See* Comm.'s Resp. in Opp'n, at 4-5].

7

Preliminarily, it is well-settled that *Miranda* warnings are *only* required prior to custodial interrogations. *See Commonwealth v. Johnson*, 541 A.2d 332, 336 (Pa. Super. Ct. 1988) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)) (emphasis added). "The factors that the court considers to determine whether there has been a custodial interrogation include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions." *Commonwealth v. Busch*, 713 A.2d 97, 100 (Pa. Super. Ct. 1998).

In this case, application of the factors above demonstrates that Defendant was not subject to the requisite custodial detention at the time Ofc. Ondarza observed the gun in plain view, and instead, the officer's basic inquiry properly fell within the ambit of an investigatory detention. *See Commonwealth v. Revere*, 888 A.2d 694, 707 (Pa. 2005) (Holding that certain exigencies, particularly, the need for safety or security in conducting and completing an investigative detention merit restricting freedom of movement..) Preliminarily, Ofc. Ondarza's conduct in asking the Jetta's operator for license, registration, and proof of insurance was wholly appropriate, and his nearly simultaneous plain view observation of the weapon between Defendant's feet properly necessitated inquiry for officer safety. *See Commonwealth v. Pratt*, 930 A.2d at 563 (internal citations omitted) ("[A]llowing police officers to control all movement in a traffic encounter . . . is a reasonable and justifiable step towards protecting their safety."); *see also Commonwealth v. Winfield*, 835 A.2d at 369 (An individual cannot have a reasonable expectation of privacy in an object that is in plain view.); *see also Commonwealth v. Truggles*, 58 A.3d 840, 844 (Pa. Super. Ct. 2012) ("Where a person performs an activity that is indicative of an attempt to secrete a weapon, that movement, regardless of whether it is singular or multiple, can support a belief that the person has a gun.").

More specifically, the plain view doctrine permits the warrantless seizure of evidence where a police officer views an object from a lawful vantage point, and it is immediately apparent that object is incriminating." *Commonwealth v. Petroll*, 576, 738 A.2d 993, 999 (Pa. 1999); *Commonwealth v. Ballard*, 806 A.2d 889, 891

8

(Pa. Super. Ct. 2002). The plain view doctrine is based on the principle that "an individual cannot have a reasonable expectation of privacy in an object that is in plain view." *Commonwealth v. Winfield,* 835 A.2d 365, 369 (Pa. Super. Ct. 2003) (internal citation omitted). In *Berkemer v. McCarty,* the United States Supreme Court evaluated Fourth and Fifth Amendment concerns with regard to traffic stops, as follows:

> The usual traffic stop is more analogous to a so-called '*Terry* stop' than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose observations lead him to suspect that a particular person has committed, is committing, or is about to commit a crime, may detain that person in order to investigate the circumstances that provoke that suspicion. The stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask that detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obligated to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda.* The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda.*

> The clear import of *Berkemer* is that traffic stops, like *Terry* stops, constitute *investigative* rather that *custodial* detentions, unless under the totality of the circumstances the conditions and duration of the detention become the functional equivalent of an arrest. *Commonwealth v. Ellis,* 549 A.2d 1323 (Pa. Super. Ct. 1988) (citation omitted, emphasis in original); *see also Pennsylvania v. Bruder,* 488 U.S. 9 (1988) (a single police officer asking defendant a modest number of questions and requesting him to perform a simple balancing test at a location visible to passing motorists constitutes an ordinary traffic stop and does not involve custody for purposes of *Miranda.*) Thus, we must review the totality of the circumstances to determine whether facts existed which would elevate this traffic stop to the "functional equivalent of an arrest."

*Commonwealth v. Haupt,* 567 A.2d 1074, 1078 (Pa. Super. Ct. 1989) (some citations & quotations omitted for clarity); *see Rosas,* 875 A.2d at 347 (Police have requisite reasonable suspicion sufficient to detain driver based on his failure, after a lawful traffic stop, to produce any of the following: valid driver's license, precise home address, proof of insurance, registration or identification.); *Commonwealth v. Zhahir,* 751 A.2d 1153, 1156-57 (Pa. 2000) (internal citation omitted). Here, Ofc. Ondarza's valid traffic stop, and its concomitant temporary detention of the vehicle and its occupants did not trigger *Miranda* protections. Instead, his plain view

9

observation of the weapon secreted at Defendant's feet, which upon generalized inquiry ("what's that on the floor right there?") Defendant suspiciously sought to conceal, necessitated further inquiry for officer safety.

Moreover, our Courts have consistently held that "the Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* [] and its progeny recognize that the essence of good police work is for the police to adopt an intermediate response where they observe a suspect engaging in unusual and suspicious behavior. A brief stop of a suspicious individual, in order to determine his identity or to maintain the *status quo* momentarily while obtaining more information, may be reasonable in light of facts known to the officer at the time." *Rosas*, 875 A.2d at 347. In balancing the right of citizens to be free from unreasonable searches and seizures and protecting the safety of citizens and police officers, the Courts must be guided by common sense concerns, giving preference to the safety of the officer during an encounter with a suspect where circumstances indicate that the suspect may have, or may be reaching for, a weapon. *See Commonwealth v. Mack*, 953 A.2d 587, 590 (Pa. Super. Ct. 2008) (internal citation omitted).

In *Haupt*, the Superior Court analyzed the following factual recitation before reversing the trial court's suppression:

> On August 6, 1987, Trooper David Toohey of the Pennsylvania State Police initiated a traffic stop because of a faulty exhaust system on Defendant's vehicle. When the trooper approached Defendant's vehicle, he noticed on the seat next to Defendant was a revolver in its holster. [*sic*] Upon seeing the revolver, Trooper Toohey ordered Defendant out of the car and up against the front of the vehicle. Defendant was ordered to remain in that position while the trooper inspected the gun and obtained its serial number.
>
> During this time, the trooper also asked Defendant questions concerning his reasons for having the gun in the car, as well as whether Defendant had the proper permits for the gun. Defendant was not placed under arrest at this time, nor was he read his *Miranda* rights.

*Id.* at 1075-76. In its final analysis, the Court held that the questions asked by the trooper during the valid traffic stop to ascertain defendant's identity and obtain information necessary to confirm or dispel the trooper's

10

suspicions that defendant was committing a crime involving a firearm, fell well within the ambit of investigative detention, rather than a custodial interrogation. *Id.*

Likewise, in this case, Ofc. Ondarza's above-referenced generalized inquiries did not create a custodial interrogation, but rather a justified investigative detention. *See Busch,* 713 A.2d at 100. More specifically, Ofc. Ondarza's inquiries were based on his reasonable suspicion arising from his plain view observation of a weapon and Defendant's furtive movements in attempting to hide it. Additionally, as aptly reflected by the record, no more than a minute or two transpired between the time Ofc. Ondarza initially reached the operator's window, observed the weapon in plain view, Defendant admitted he lacked a permit, and ultimately accepted responsibility. As such, the length of the detention was in no way coercive, as it lasted no more than a minute or two, and was only minimally extended for safety concerns precipitated by the weapon's presence and Ofc. Ondarza's reasonably related reflective call for backup. Moreover, Defendant's admission that he possessed the gun without a license occurred before he was removed from the vehicle, and officers gleaned no additional incriminating information from him once he had exited the vehicle. Additionally, Ofc. Ondarza's calm professional demeanor throughout the entirety of the traffic stop, and the ensuing investigation, and his straightforward and respectful investigative method in no way elevated this encounter to a custodial interrogation. To the contrary, Ofc. Ondarza's levelheaded composure ameliorated the atmosphere despite the operator's dramatic emotional outburst and increasing agitation. As such, all of the above-referenced factors aptly demonstrate that Defendant was subject only to a valid and justified investigative detention, limited in scope and duration to provide Ofc. Ondarza with the requisite minimal reasonable time to investigate.

Contrary to Defendant's assertion, articulated for the first time at the suppression hearing, that our Supreme Court's recent holding in *Commonwealth v. Hicks,* 208 A.3d 916 (Pa. 2019) precluded Defendant

11

from being the subject of a legal custodial detention, a review of *Hicks* demonstrates it is inapposite, and in fact supportive of Ofc. Ondarza's investigatory questions as to ownership and permitting to carry a gun.[32]

> In *Hicks*, officers responded to a camera operator of a gas station reporting a man with a gun. The camera operator saw the defendant, via live surveillance, with a weapon, in a high-crime area, at 3:00 a.m. When the officers arrived, they saw the defendant driving his vehicle to exit the parking lot. After they saw *Hicks* move his hands in the vehicle, they ordered Hicks to keep his hands up. Then, they performed an investigative stop and took defendant's gun from the holster on his waistband. The officers restrained Hicks and removed him from the vehicle. The officers smelled alcohol on Hicks and discovered marijuana during a search of his pockets. Upon further investigation, the officers discovered that Hicks had a license to carry a concealed weapon. Hicks was charged with driving under the influence and possession of marijuana.
>
> Our Supreme Court found the investigative stop violated the fourth amendment because the mere possession of a firearm does not raise a reasonable suspicion that crime is afoot.[2] It noted that "an individual licensed to carry a firearm may do so in public, openly or concealed, within a vehicle or without, throughout every municipality in Pennsylvania." *Id.* at *926.⁰ Thus, there "is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity." *Id.* at *937. In other words, because a firearm can be legally carried anywhere in the state, a firearm alone cannot give rise to a reasonable suspicion of criminal activity. Unless the officer is aware a person is not permitted to possess a firearm, mere possession of a firearm does not raise a reasonable suspicion of criminal activity.

*Commonwealth v. Mike*, 2019 WL 3290945, at *3 (Pa. Super. Ct. July 22, 2019) (quoting *Hicks*, 208 A.3d 916).

As such, *Hicks* dealt with the issue of whether possession of a firearm by an individual in public, in and of itself, substantiates the requisite reasonable suspicion for an officer to detain that individual to investigate whether that individual is properly licensed.

In this case, Ofc. Ondarza had already legally stopped the vehicle in which Defendant was an occupant for a motor vehicle violation; for which he had probable cause to investigate. Because the observation of the firearm was not the initial factor triggering Ofc. Ondarza's vehicle stop and investigation, *Hicks'* is instantly inapplicable. Moreover, and contrary to Defendant's assertion, *Hicks'* holding supports the reasonableness and necessity of Ofc. Ondarza's investigative detention and questioning as to ownership and permitting to carry a gun to dispel or confirm the unfolding scene; as possession of the gun in and of itself does not give rise to criminal culpability.

---

[32] [N.T. 6/26/19, at 3-10]; [Commw.'s Supp. Resp. to Def.'s Omnibus (6/28/19)].

12

Additionally, as acknowledged during the suppression hearing, so long as the initial detention is valid, Ofc. Ondarza's ability to ultimately verify Defendant's status as a person not to possess, via JNET and/or his emergency dispatch — an independent source — sanitizes any potential illegality arising from *Miranda*, which might have arguably tainted his inquiry of Defendant (as to whether he: possessed a permit/ OR/ owned the gun....)[33] Ofc. Ondarza's unanticipated, nearly immediate plain view observation of the weapon at Defendant's feet, and his furtive movements to hide it which instinctively precipitated his inquiry as to the precise nature of the object, was part and parcel of a routine traffic stop, and certainly did not amount to a custodial interrogation requiring *Miranda* warnings be provided to Defendant. *See Ellis, Johnson, supra.* Nor for that matter, did the officer's follow-up inquiry, as to the gun's ownership escalate or transform the situation to a custodial interrogation. Instead, these inquiries, along with his request of the vehicle's operator, seconds before, for her license, registration, and proof of insurance, all fall well within the ambit of a routine traffic stop investigation. The record aptly reflects that Defendant's admission was not induced by any untoward police coercion or reasonably related a sense of deprivation of his freedom, but instead, was triggered by a sense of loyalty or chivalry he felt for the sake of his girlfriend who had begun to accept responsibility for possession of the weapon despite its attendant criminal consequences.[34] *See Rogers*, 849 A.2d at 1192. In any event, Ofc. Ondarza's plan view observation of the weapon was ultimately bolstered and informed by independent sources and his related inevitable confirmation via JNET and his dispatch, that none of the occupants possessed a permit for it; supplying probable cause to arrest Defendant. *See Wiley*, 904 A.2d at 907.[35] As such, the Court properly denied Defendant's Motion to Suppress, and his claim on appeal, likewise, fails.

---

[33] [N.T. 6/26/19, at 4-6].

[34] [N.T. 6/26/19, at 28-29]. Defendant's admitted that he felt he "should take ownership of it because he's the man."

[35] [N.T. 6/26/19, at 5-10, 49-50]. By virtue of the officers' independent ability to confirm Defendant's status as a person not to possess, Defendant concedes that determination was not subject to suppression as 'fruit of the poisonous tree.'

# V. CONCLUSION

Accordingly, the trial court respectfully requests that the judgment of sentence imposed upon Defendant, Gary Townsend, be AFFIRMED.

BY THE COURT:

THOMAS C. BRANCA,                    J.

Copies of the above Opinion
Sent on 7/31/20
**By Email to:**
Katherine E. Ernst, Esquire, Montgomery County Public Defender's Office- Appellate Division
Montgomery County District Attorney's Office- Appellate Division
Court Administration- Criminal

Secretary

14